## RONALD COLEMAN AND NANCY COLEMAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7216-83.        Filed July 23, 1986.

*Matthew H. Ross* and *Leon C. Baker,* for the petitioners.[1]
*Susan G. Lewis* and *Patricia H. Delzotti,* for the respondent.

TANNENWALD, *Judge*: Respondent determined deficiencies in petitioners' Federal income taxes for taxable years 1979 and 1980 of $2,189 and $2,442, respectively, relating to petitioner Nancy Coleman's 1-percent interest in a computer leasing transaction. In his amended answer, respondent alleged additional deficiencies for taxable years 1979 and 1980 of $31,840 and $64,700, respectively, relating to petitioner Ronald Coleman's interest in the same transaction. The issues for decision are whether petitioners' deductions for depreciation and interest expenses were properly disallowed.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. This reference incorporates the stipulations of facts and attached exhibits. At the time they filed their petition in this case, petitioners resided in Oradell, New Jersey. Petitioners timely filed joint Federal income tax returns for 1979 and 1980.

---

[1]Brief amicus curiae was filed by *Martin Allen* as attorney for the Computer Dealers & Lessors Association. To some extent, the brief of the amicus curiae and, to a greater extent, respondent's response thereto went beyond the record herein. Such extracurricular excursions were totally without effect on the Court's analysis and decision herein.

During the years 1979 and 1980, petitioner Ronald Coleman was a one-third partner in Majestic Construction Co. (Majestic), a New Jersey general partnership. The other partners were Ronald Coleman's brothers, Harvey and William Coleman. Majestic's business was constructing rental income properties for its own account. During 1979, William Coleman and Leon C. Baker, a first cousin of the Colemans and an attorney who had been involved with equipment leasing since 1972, discussed Majestic's need for a tax shelter and the economic and tax aspects of computer leasing. Baker approached Nigel Leopard, a representative of Carena [Computers] B.V. (Carena), a Netherlands corporation, to develop a deal for the Colemans. Baker had dealt with Leopard for about 7 years, the latter generally acting as an intermediary between European leasing companies and American brokers who, in turn, sought investors for equipment leasing transactions. Baker sought from Leopard an equipment transaction that gave the Colemans an "inside price," i.e., a higher percentage of leverage than that featured in typical equipment deals.

Leopard contacted Vernon Davies, cofounder and, at that time, president of Atlantic Computer Leasing p.l.c. (Atlantic). Atlantic, a United Kingdom (U.K.) corporation, was a large, reputable supplier of configured computer systems consisting of IBM central processors, IBM operating systems, and IBM and IBM-compatible peripherals. Atlantic supplied such equipment mainly through "arranged leases," i.e., transactions in which Atlantic arranged financing for its customers by transferring title to the equipment to financial institutions or corporate leasing subsidiaries and arranging leases between these parties as lessors and the customer-users as lessees. To a lesser extent, Atlantic utilized direct leases and outright sales to its customers. Leopard had known Davies for approximately 2 years, and had done several deals with him, by the time of their meeting regarding the Colemans' transaction. Their negotiations centered on certain computer equipment (the equipment) financed through leases "arranged" between seven lessors (the lenders) and six end users and having the terms set forth in the chart on pages 180-181.[2]

---

[2] For the notes to the following table, see p. 181 *infra*.

| User-lessee | Lender-lessor | Quantity | Equipment | Initial lease term[1] | Monthly rental (exclusive of VAT)[2] |
|---|---|---|---|---|---|
| (1) Reuters, Ltd. | Mansfield Hosery Mills, Ltd. | 1<br>1 | 3138-J Processor<br>3046-I Power unit | Dec. 28, 1979–June 28, 1982 | £5,298 |
| (2) Northumberland County Council | Beaverline Leasing, Ltd. | 1<br>1 | 3138-J Processor<br>3046-I Power unit | Nov. 5, 1979–Nov. 5, 1982 | £5,550 for first 2 years, £4,000 thereafter |
| (3) Thomson Travel, Ltd. | Thompson, Lloyd & Ewart, Ltd. | 1 | 3330-1 Disk storage | Feb. 27, 1978 Feb. 27, 1982 | £587 |
| (4) Torrington Co., Ltd. | Anochrome, Ltd. | 1<br>1<br>1<br>1 | 3135-I Processor<br>3046-I Power unit<br>3215-1 Console printer<br>1403-N1 Printer | Mar. 1, 1979–Mar. 1, 1984[3] | £2,500 |
| (5) Chesire County Council | A. Beckman, Ltd. | 2<br>1<br>1 | 3350-B2 Direct access storage<br>3350-A2 Direct access storage<br>3350-C2 Direct access storage | June 29, 1979–Dec. 29, 1985 | £1,490 |
| (6) Cheshire County Council | Noble Grossart, Ltd. | 1<br>1 | 333-11 Disk storage and control<br>3330-11 Disk storage | July 13, 1979–Jan. 13, 1986 | £860 |

(continued)

| | | | | | |
|---|---|---|---|---|---|
| (7) Cheshire County Council | Noble Grossart, Ltd. | 2 | 3880-2 Storage control | Sept. 28, 1979– Mar. 28, 1986 | £3,200 |
| | | 1 | 3350-A2 Direct access storage | | |
| | | 1 | 3350-B2 Direct access storage | | |
| (8) C & J Clark, Ltd. | S. Mason Leasing, Ltd. | 1 | 1403-N1 Printer | Mar. 30, 1979 | £895 |
| | | 1 | 2821-2 Control unit | Mar. 30, 1981 | |

[1]We note that the initial terms for leases 1 and 2 began after the negotiations between Leopard and Davies probably took place, and that the Reuters lease began after the execution of the agreements comprising the instant transaction. However, given no indication to the contrary, we will assume that the leases were all negotiated and "arranged" prior to the negotiations and agreements relating to the instant transaction.

[2]VAT is the U.K. value-added tax, imposed on consumption at every level. Atlantic's leases provided for a monthly or quarterly rental "Plus V.A.T."

[3]The Torrington lease provides for commencement of the 5-year term "On Acceptance." The record, however, does not contain a copy of the acceptance note. Based upon the other leases and acceptances, and upon the February 23 execution of the Torrington lease, we estimated an early March commencement of the Torrington lease term. Such estimate, incorrect at most by a month, has no bearing on our decision herein.

In each of these "arranged-lease" transactions, Atlantic had purchased the equipment, transferred title thereto to the lender, and arranged the initial lease between the lender and the user-lessee.[3] Atlantic generally transfers title to lenders in order to get lower financing rates from them, and thus to be competitive in the user market; because U.K. tax law provides for first-year expensing of equipment costs by the title holder, and lenders offer better rates in exchange for title to the equipment. In each case, the lender provided Atlantic with an amount based upon the discounted value of the stream of rents receivable under the leases being arranged. Such amount included the value-added tax (VAT) imposed by the United Kingdom on consumption.[4] In each lease agreement, the lender covenants to the user-lessee that it is "the lawful owner of the Machines leased hereunder." Additionally, each of the leases contains an automatic renewal provision that is to take effect if the lessee does not terminate its lease in writing within 3 months after completion of the initial term. Atlantic bears no recourse credit risk with respect to the arranged leases; upon default by a lessee, the lender, as lessor, is entitled under its lease agreement to take immediate possession of the subject equipment, and would look to Atlantic for help in arranging a new lease in order to recoup its losses. Atlantic has no legal obligation to provide such help.

Concurrently, Atlantic and the lenders entered into residual agreements whereby Atlantic retained or still retains options to repurchase the equipment for nominal consideration upon completion of the leases' initial terms, "subject to the receipt of all monies due thereunder or the receipt of

---

[3] A 1983 prospectus offering shares of Atlantic refers to these arranged leases as follows:

"Equipment is purchased by Atlantic from suppliers and sold to third party lessors, usually banks or other financial institutions, with the benefit of a lease entered into by Atlantic's customer. The terms of the sale depend upon prevailing rates of interest and other factors, including the time of year at which a lease is entered into, levels of economic activity and relevant tax legislation. Atlantic does not bear the credit risk in respect of arranged leases.

"Atlantic retains a residual interest in the form of an option to acquire the equipment for an amount up to 2 percent of the original selling price at the expiry of the primary lease term or upon earlier termination of the lease. * * *"

[4] Apparently, the lenders paid Atlantic the discounted value of the rental stream including VAT because they received a VAT credit from the U.K. tax authority for VAT amounts remitted to Atlantic. VAT amounts received by the lenders with the lessees' rental payments were apparently turned over to the United Kingdom.

an agreed early termination settlement."[5] Atlantic generally looks to the residual value of equipment to make a profit on its "arranged-lease" transactions. This is so because the combination of intense competition in the user market, forcing low rentals and thus lower payments from lenders, the necessity of giving the lenders title to the equipment during the initial lease terms, and the costs associated with arranging the lease transactions and purchasing the equipment frequently drains the initial leases of any profit potential for Atlantic. Atlantic carried its residual interests in the equipment on its balance sheet at a discount from the IBM list price in effect at the time of valuation, less the cost of repurchase under the residual agreements and estimated remarketing costs. A valuation committee meets regularly to calculate the appropriate discount factors for the various equipment in which Atlantic has residual interests, and takes into account factors such as the equipment type, the initial lease terms, money market rates, and IBM product announcements; with regard to the last factor, the committee, based on past experience with the

---

[5] Atlantic retained a 90-day option to repurchase with respect to the leases numbered 4 and 5, see p. 180 *supra*; with respect to the other leases, Atlantic retained a right to repurchase not specifically limited in time. The repurchase price under the residual agreements is £1 for leases 3 and 8, 1/2 percent of the Lender-lessor's original "cost" (i.e., amount of funds provided) for lease 5, 1 percent of such cost for leases 2 and 4, and 2 percent of such cost for leases 1, 6, and 7. Atlantic's total repurchase price, assuming repurchase at the end of each of the initial lease terms, may be computed as follows:

| Lease | | Repurchase price |
|---|---|---|
| (1) Reuters | £3,218 | (.02 x £160,903) |
| (2) Northumberland | 1,894 | (.01 x £189,379) |
| (3) Thomson travel | 1 | |
| (4) Torrington | 1,439 | (.01 x £143,851) |
| (5) Cheshire | 502 | (.005 x £100,418) |
| (6-7) Cheshire | 5,486 | (.02 x £274,277) |
| (8) C & J Clark | 1 | |
| Total | £12,541 | |

See p. 186 *infra*. For the 3 Cheshire leases, for which the record contains one aggregate "financing obtained" figure, we computed the repurchase prices by allocating the total financing obtained from the lenders on such leases to the individual Cheshire leases pro rata by the rentals stated on the leases.

All of the agreements give Atlantic, on repurchase, the benefit of any lease not terminated at the end of its initial term. Early termination (e.g., due to default by a lessee) has the following consequence: for leases 3 to 8, Atlantic has the same repurchase rights as in the case of no early termination; for leases 1 and 2, Atlantic has a right to repurchase the equipment for a price equal to the discounted value of the equipment, less any termination charge received by the lender-lessor, plus the repurchase price that would apply without early termination. For leases 1, 2, 6, and 7, in the event the lender-lessor accepts a follow-on lease with the same lessee within 6 months after the end of the initial lease term, the lender-lessor is required to refund to Atlantic 50 percent of Atlantic's repurchase price, i.e., the £1, 1/2 percent, 1 percent, or 2 percent.

accuracy of such announcements, exercises a degree of skepticism, and does not accept such announcements at face value. Remarketing costs include the expenses necessary to refurbish the equipment to the engineering and cosmetic specifications of the new user-lessees after the completion of the initial leases. These expenses total up to 15 percent of the cost of the equipment being refurbished. Maintenance and repair expenses necessary to bring the equipment as configured to peak performance are not included in the remarketing costs, as user-lessees are required to arrange with IBM for such maintenance. The user-lessees are also required to carry insurance on the equipment.

The financial information with respect to the equipment is as shown in the chart on pages 186-187.[6]

Leopard negotiated with Davies a deal known to Atlantic as a "forward sale," whereby Atlantic sells to an investor its residual interest in leased equipment.[7] Their intense negotiations centered on the amount of cash that would flow from the Colemans to Atlantic, and the degree to which the Colemans would share in the residual value of the equipment. Upon the conclusion of these negotiations, Baker, apparently after ironing out the details with Leopard, wrote the following letter, dated October 16, 1979, to William Coleman proposing the equipment leasing deal:

Dear Bill:

Enclosed are two schedules on an equipment leasing deal which I believe would be suitable for your purposes. The first schedule provides for no minimum net cash flow and the second provides for a small minimum. Naturally, the cash investment is higher in the second case. In either case, there would be contingent rent payable commencing in the fifth year.

The equipment would be data processing or other office equipment with a six year depreciation life for tax purposes. The cash investment would be approximately 7½% of cost without minimum cash flow and approximately 8.55% of cost with minimum cash flow. The investment can be

---

[6] For the notes to the table on page 186, see page 187.

[7] A 1983 prospectus offering shares of Atlantic refers to the forward sales as follows:

"Such sales, which relate to equipment at present on lease, involve the receipt by Atlantic of almost all of the sales price within eighteen months of the sale although delivery will take place some 7 to 11 years in the future. * * * These transactions depend for their economic viability from the purchaser's point of view, upon the provisions of the tax legislation of the United States of America. Accordingly any change in the relevant tax legislation or administrative practice on the part of the United States Internal Revenue Service could reduce sales of the kind hitherto made by Atlantic, or possibly cause them to cease."

paid in three installments over a period spaced over three fiscal years, with interest on the unpaid portion of the investment of 12% per annum.

As in all tax shelters, the key is leverage. You invest 7.5 or 8.55 cents and you depreciate $1.00.

The good news is that you could generate tax losses, per $1,000,000 of equipment, of $90,000 in 1979 and $146,695 in 1980, which could be carried back to 1979. Actually, since there are four of you, you could get $16,000 of first year depreciation in 1979, if you have not taken this amount on other property, and $40,000 of accelerated depreciation in each year without paying minimum tax. This would bring the total for the two years to over $400,000 so you could solve your entire 1979 problem with two $1,020.000 [sic] units.

By 1981 your new project should be generating substantial ordinary income so you could use the additional deductions generated in 1981 through 1984.

The bad news, of course, is that in 1985 the deal turns around and you would start generating taxable income without cash flow. There are ways to avoid this, but the conservative assumption to make is that you will be obligated to pay the taxes projected in the years 1985 through 1990.

How do you make out overall? The last column entitled "Sinking Fund Analysis at 7% A.T." assumes that net tax savings are invested to earn 7% after taxes and that the accumulation is used to pay the taxes when they become due. (Actually, of course, no one does this. It is only a method of financial analysis.) You will note that the accumulation as a $1,020,000 "module" grows to a maximum of $466,011 and then declines to $199,461. At no time do you have any net investment in the deal and you wind up with $199,461 even after paying taxes. You would be paying the taxes, of course, in dollars which are likely to be worth much less than the tax dollars you would be saving currently.

As I indicated earlier, there are three favorable possibilities which are not reflected in the tables: (1) you may be able to avoid the tax on the turnaround if there is no change in law before 1985; (2) you may receive contingent rental; and (3) the equipment may have residual value in 1990. There are pluses but the deal should be evaluated on the basis that none will eventuate.

If you are interested, I will have to contact the owners of the equipment to make sure that there is $2,000,000 available (or whatever amount you are interested in). I am leaving for China on October 26, so, if you want to proceed you should let me know before then, even though the closing need not take place until later.

Sincerely yours,

(S)LEON C. BAKER

The schedules referred to in Baker's letter read, in relevant part, as shown on pages 188-189.

The table on page 190 represents the comparable calculations, under the "contingent flow assumption," on an

| Lease | Date of Atlantic's purchase | Cost to Atlantic (including VAT) | IBM (UK) list price (including VAT) late 1979[1] | Amount obtained from lenders |
|---|---|---|---|---|
| (1) Reuters | July 27, 1977 | [2]£308,103.48 | £267,547.50 | £160,903 |
| (2) Northumberland | Nov. 5, 1979 | [3]£136,016.25 | £229,897.65 | £189,379 |
| (3) Thomson Travel | Jan. 10, 1979 | [4]£18,079.21 | £27,694.30 | £29,489 |
| (4) Torrington | Jan. 30, and Feb. 15, 1978 | [5]£220,018.00 | £475,459.45 | £143,851 |
| (5-7) Cheshire | June 29, July 12, and Sept. 28, 1979 | [6]£238,545.98 | £351,466.45 | £374,695 |
| (8) C & J Clark | Nov. 6, 1978 | £29,700.00 | £54,605.45 | £23,461 |
| Totals | | £950,462.92 | £1,406,670.70 | £921,778 |
| Conversion to dollars[7] | | $1,831,500.72 | $2,710,593.47 | $1,776,226.13 |

[1]We calculated the figures in this column by pricing the equipment appearing on the invoices using the 1979 IBM (U.K.) price list, all of which are part of the record herein. For the Northumberland lease (number 2), no invoice appears; thus, we used the equipment list appearing on the lease, as apparently petitioners' expert did in compiling his financial information. Our figures differ in some instances from those presented by petitioners' experts.

[2]This figure inexplicably differs from petitioners' expert's figure. Our figure comes directly from the invoice purported by petitioners to relate to the equipment on the Reuters lease (number 1). We note that the purported invoice, however, lists equipment not identical to that listed on the Reuters lease—the invoice lists a 3138-I processor while the lease lists a more expensive 3138-J processor. We calculated the cost to Atlantic based on the invoice, as such is the only evidence thereof, and the IBM (U.K.) list price based on the actual equipment leased.

[3]As noted, note 1 *supra*, no invoice for this equipment appears in the record herein. The only evidence of Atlantic's purchase is a copy of a ledger page containing this figure and date.

[4] Atlantic acquired this equipment from a French company for 145,000 French francs, and apparently paid no VAT (known in France as TVA) thereon. For comparative purposes, we have added 15 percent to a figure in pounds appearing in handwriting on the invoice, used by petitioners' expert and nowhere objected to by respondent. We note that this would place the exchange rate at about 9.22 FF/£.

[5]For this figure, we defer to petitioners' expert, as the invoices in the record herein refer to slightly different equipment from that covered by the Torrington lease.

[6]We note that two of the three invoices relating to the Cheshire leases are made out to Cheshire County Council, rather than Atlantic. Also, as with the Reuters equipment, one of the Cheshire leases lists equipment (model numbers 3330-11 and 3333-11) different from that listed on the related invoice (model numbers 3330-01 and 3333-01). We resolved this problem in the same manner as we did the Reuters problem. See note 2 *supra*.

[7]For purposes of comparison with the stated purchase prices in the later agreements, we converted the amounts in pounds sterling to dollars and subtracted out the VAT components, using the exchange rate asserted by petitioners and undisputed by respondent for Dec. 26, 1979, $2.216/£, and the 15-percent VAT rate.

DATA PROCESSING EQUIPMENT LEASE
MINIMUM CASH-FLOW

| Year | Rental income | Depreciation S.L. 6 years | Legal expense and interest on deferred investment | Mortgage Amortization | Interest | Cash-flow | Tax loss (income) | Tax savings (tax) 70% | Tax savings plus cash-flow | Investment | Accumulation | Sinking fund (7% after tax) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1979 | 0 | $85,875 | $5,000 | 0 | 0 | 0 | $90,875 | $63,613 | $63,613 | $33,000 | $30,613 | $30,613 |
| 1980 | $83,575 | 171,750 | 3,150 | $25,825 | $57,000 | $750 | 148,325 | 103,828 | 104,578 | 38,650 | 65,928 | 98,684 |
| 1981 | 167,150 | 171,750 | 2,040 | 56,392 | 109,258 | 1,500 | 115,898 | 81,129 | 82,629 | 19,040 | 63,589 | 169,190 |
| 1982 | 167,150 | 171,750 | | 63,362 | 102,288 | 1,500 | 106,888 | 74,822 | 76,322 | | 76,322 | 257,355 |
| 1983 | 167,150 | 171,750 | | 71,194 | 94,457 | 1,500 | 99,056 | 69,339 | 70,839 | | 70,839 | 346,209 |
| 1984 | 167,150 | 171,750 | | 79,993 | 85,657 | 1,500 | 90,257 | 63,180 | 64,679 | | 64,679 | 435,123 |
| 1985 | 167,150 | 85,875 | | 89,881 | 75,770 | 1,500 | (5,505) | (3,854) | (2,354) | | (2,354) | 463,227 |
| 1986 | 167,150 | | | 100,990 | 64,661 | 1,500 | (102,490) | (71,743) | (70,243) | | (70,243) | 425,410 |
| 1987 | 167,150 | | | 113,472 | 52,179 | 1,500 | (114,972) | (80,480) | (78,980) | | (78,980) | 376,209 |
| 1988 | 167,150 | | | 127,497 | 38,153 | 1,500 | (128,997) | (90,298) | (88,798) | | (88,798) | 313,746 |
| 1989 | 167,150 | | | 143,256 | 22,395 | 1,500 | (144,756) | (101,329) | (99,829) | | (99,829) | 235,879 |
| 1990 | 83,575 | | | 78,137 | 4,688 | 750 | (78,887) | (55,221) | (54,471) | | (54,471) | 197,919 |

## DATA PROCESSING EQUIPMENT LEASE
### CONTINGENT CASH-FLOW ONLY

| Year | Rental income | Depreciation S.L. 6 years | Legal expense and interest on deferred investment | Mortgage Amortization | Interest | Cash-flow | Tax loss (income) | Tax savings (tax) 70% | Tax savings plus cash-flow | Investment | Accumulation | Sinking fund (7% after tax) |
|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 1979 | 0 | $85,000 | $5,000 | 0 | 0 | 0 | $90,000 | $63,000 | $63,000 | $33,000 | $30,000 | $30,000 |
| 1980 | $82,825 | 170,000 | 2,520 | $25,825 | $57,000 | 0 | 146,695 | 102,687 | 102,687 | 32,520 | 70,167 | 102,267 |
| 1981 | 165,650 | 170,000 | 1,440 | 56,392 | 109,258 | 0 | 115,048 | 80,534 | 80,534 | 13,440 | 67,094 | 176,520 |
| 1982 | 165,650 | 170,000 | | 63,362 | 102,288 | 0 | 106,638 | 74,647 | 74,647 | | 74,647 | 263,523 |
| 1983 | 165,650 | 170,000 | | 71,194 | 94,457 | 0 | 98,806 | 69,164 | 69,164 | | 69,164 | 351,134 |
| 1984 | 165,650 | 170,000 | | 79,993 | 85,657 | 0 | 90,007 | 63,005 | 63,005 | | 63,005 | 438,718 |
| 1985 | 165,650 | 85,000 | | 89,881 | 75,770 | 0 | (4,881) | (3,417) | (3,417) | | (3,417) | 466,011 |
| 1986 | 165,650 | | | 100,990 | 64,661 | 0 | (100,990) | (70,693) | (70,693) | | (70,693) | 427,939 |
| 1987 | 165,650 | | | 113,472 | 52,179 | 0 | (113,472) | (79,430) | (79,430) | | (79,430) | 378,465 |
| 1988 | 165,650 | | | 127,497 | 38,153 | 0 | (127,497) | (89,248) | (89,248) | | (89,248) | 315,709 |
| 1989 | 165,650 | | | 143,256 | 22,395 | 0 | (143,256) | (100,279) | (100,279) | | (100,279) | 237,530 |
| 1990 | 82,825 | | | 78,137 | 4,688 | 0 | (78,137) | (54,696) | (54,696) | | (54,696) | 199,461 |

| Year | Rental income | Depreciation S.L. 6 years | Legal expense and interest on deferred investment | Mortgage | | Cash-flow | Tax loss (income) | Tax saving (tax) 70% | Tax saving plus cash-flow | Investment | Accumulation | Sinking fund (7% after tax) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Amortization | Interest | | | | | | | |
| 1979 | 0 | $171,296 | $5,000 | 0 | 0 | 0 | $176,296 | $123,407 | $123,407 | $66,176 | $57,231 | $57,231 |
| 1980 | $158,206 | 342,592 | 5,053 | $43,903 | $114,303 | 0 | 303,742 | 212,619 | 212,619 | 65,213 | 147,406 | 208,643 |
| 1981 | 316,412 | 342,592 | 1,444 | 95,866 | 220,546 | 0 | 248,170 | 173,719 | 173,719 | 25,508 | 148,211 | 371,459 |
| 1982 | 316,412 | 342,592 | | 107,715 | 208,697 | 0 | 234,877 | 164,414 | 164,414 | 0 | 164,414 | 561,875 |
| 1983 | 316,412 | 342,592 | | 121,029 | 195,383 | 0 | 221,563 | 155,094 | .155,094 | 0 | 155,094 | 756,301 |
| 1984 | 316,412 | 342,592 | | 135,988 | 180,424 | 0 | 206,604 | 144,623 | 144,623 | 0 | 144,623 | 953,865 |
| 1985 | 316,412 | 171,296 | | 152,796 | 163,616 | 0 | 18,500 | 12,950 | 12,950 | 0 | 12,950 | 1,033,585 |
| 1986 | 316,412 | | | 171,682 | 144,730 | 0 | (171,682) | (120,177) | (120,177) | 0 | (120,177) | 985,759 |
| 1987 | 316,412 | | | 192,902 | 123,510 | 0 | (192,902) | (135,031) | (135,031) | 0 | (135,031) | 919,731 |
| 1988 | 316,412 | | | 216,745 | 99,667 | 0 | (216,745) | (151,721) | (151,721) | 0 | (151,721) | 832,391 |
| 1989 | 316,412 | | | 243,534 | 72,878 | 0 | (243,534) | (170,474) | (170,474) | 0 | (170,474) | 720,185 |
| 1990 | 316,412 | | | 273,634 | 42,778 | 0 | (273,634) | (191,544) | (191,544) | 100 | (191,644) | 578,954 |
| 1991 | 158,206 | | | 149,250 | 8,956 | 0 | (149,250) | (104,475) | (104,475) | 0 | (104,475) | 515,006 |
| Total | 3,480,532 | 2,055,552 | 11,497 | [1]1,905,044 | 1,575,488 | 0 | 162,005 | 113,404 | 113,404 | 156,997 | (43,593) | 515,006 |

[1]The difference between this amount and the $1,905,053 face value of the nonrecourse note is due to rounding off.

annual basis and based upon a 70-percent marginal tax rate and the cost, rental, and purchase price payments actually involved herein.

Baker, based upon his admittedly second-hand experience with computer leasing, believed that the residual value of the equipment might be 10 to 20 percent of the original value at the end of the 11th year after the beginning of the lease terms. This estimate seemed conservative to Baker, even recognizing that technologically new IBM equipment would drive the value of old equipment down. In discussions with the Colemans, Baker outlined the possible residual values of the equipment, but felt unqualified actually to predict the residual values, and thus did not do so. William Coleman, who had responsibility within Majestic to evaluate investments, analyzed the proposed transaction, relying solely on Baker's opinion and Majestic's experience with construction deals and used equipment, discussed the deal with his brothers, and entered into the transaction.

On December 19, 1979, Atlantic, "for and in consideration of One Pound (£1) and other good and valuable consideration received," assigned "all of Atlantic's right, title and interest in and to the residual agreements annexed hereto, including all of Atlantic's rights in and to the agreement[s] of lease described therein and the equipment covered thereby," to European Leasing, Ltd. (European), a Liberian corporation. It is unclear from the record how much "other good and valuable consideration" actually passed to Atlantic, and Baker did not, in December 1979, know the actual price of this assignment to European.

On December 26, 1979, several documents pertaining to the instant transaction were executed. Atlantic, European, Carena, and Majestic entered into a sale and purchase agreement whereby,

SUBJECT as hereinafter mentioned and in consideration of the payment herein provided, European hereby sells, transfers, and assigns to Carena all of Atlantic's Interest in the Equipment. A copy of the Lease[s], as amended is attached hereto together with a copy of the residual agreement[s] (the "Residual Agreement[s]"), made between Atlantic and

the lessor[s] (the "Lessor[s]") under the Lease[s],[6] ALWAYS PROVIDED THAT:

* * * * * * *

until the Final Date * * * , Carena will not concern itself with the leasing or additional leasing of the Equipment and all liability therefor and all benefit therefrom will be for European's account except that, commencing January 1, 1987 and continuing until and including December 31, 1990 (the "Final Date"), European shall pay, or procure the payment to Carena within a reasonable time after the same has been collected, of the following percentages of the net proceeds (as hereafter defined) from leasing of the Equipment:

1987 . . . . . . . . . . . . . . . . . 30%
1988 . . . . . . . . . . . . . . . . . 40%
1989-90. . . . . . . . . . . . . . . 50%

In each case "net proceeds" means gross proceeds actually derived less the reasonable and necessary expenses of remarketing.

The agreement states the purchase price as $95,353, all but $100 of which was payable contemporaneously with the execution of the agreement, and $100 of which is payable on December 31, 1990. Under the agreement, Atlantic and European warrant to Carena and Majestic, inter alia, that (1) the lenders own the equipment "free and clear of any claims, liens, charges or encumbrances except for the Lease[s]"; (2) "upon payment of the repurchase price specified in the Residual Agreement[s], Atlantic (acting as trustee and agent for European) will acquire title to the Equipment free and clear of any and all claims, liens, charges or encumbrances except for the Lease[s]"; and (3) the agreement "is effective to transfer to Carena Atlantic's interest in the Equipment, subject only to the payments [of $95,353], free and clear of all claims, liens, charges or encumbrances." Atlantic agrees to exercise its repurchase rights under the residual agreements, and Atlantic and European agree to "pay or cause to be paid, when due, all debts, liabilities, or obligations secured by liens, claims, charges or encumbrances on the Equipment * * * including, without limitation, all amounts due and payable by the lessee[s] under the Lease[s] and by Atlantic under the

---

[8] Exhibit A to the sale and purchase agreement contains copies of the leases and residual agreements, and some of the invoices, with respect to the equipment.

Residual Agreement[s]." Additionally, the agreement gives European and Atlantic—

the right to lease the Equipment to others within the United Kingdom until [December 31, 1990]; provided, however, that neither Atlantic nor European will agree to, or cause or permit, any lease, agreement, amendment, extension or other modification of any nature which would affect the Residual Agreement or Atlantic's Interest in the Equipment or which would create any right, title or interest of any other party in the Equipment or any lease thereof after [December 31, 1990], without the prior written consent (which consent shall not be unreasonably withheld or delayed) of [Majestic].

Under the agreement, the risk of loss and damage, and the duty to insure, rest with Atlantic and European.

On the same day, i.e., December 26, 1979, Carena and Majestic executed a purchase agreement whereby—

Majestic hereby purchases from Carena, and Carena hereby sells, transfers and assigns to Majestic, all of the IBM computers and peripheral equipment (collectively, the "Equipment") described in the lease agreements attached as part of Exhibit A hereto (the "User Leases"), subject and subordinate only to the * * * rights and interests under (a) the User Leases, of the parties thereto, and (b) the Residual Agreement[s], of the Lessor[s] under the User Leases * * * together with all of Carena's right, title and interest in and to the [Sale and Purchase Agreement].

The stated purchase price is $2,055,553, payable as follows: $66,176 by check payable to Leon C. Baker, as attorney; a recourse note for $60,160 (plus $5,053 interest) payable on July 1, 1980; a recourse note for $24,064 (plus $1,444 interest) payable on January 3, 1981; $100 on December 31, 1990; and a nonrecourse note for $1,905,053, secured under a security agreement. The purchase price was based solely on Leopard's representation to Baker of the value of the equipment, which representation Baker had no means of investigating but had reason, based on experience with Mr. Leopard, to find reliable. Under the purchase agreement, Carena warrants to Majestic that (1) "Carena owns Atlantic's Interest free and clear of all liens, charges, claims and encumbrances whatsoever"; (2) "upon the execution and delivery of this Agreement, Majestic will acquire good and marketable title in and to Atlantic's Interest, free and clear of any and all leases, liens, claims and encumbrances of any kind or nature whatsoever"; (3) "except for the User Leases,

the Residual Agreements and [the documents executed pursuant to the instant transaction] there are no agreements of any kind, written or oral which affect in any respect the Equipment"; and (4) "upon the exercise of the repurchase option provided for in each Residual Agreement, Majestic, its successors or assigns, will be the owner of the Equipment, free and clear of any lien or encumbrance except the User Lease, if then in effect, and, if then in effect, the interest of lessor under the User Lease." Carena covenants with Majestic to "exercise or cause the exercise of the repurchase option under the Residual Agreements and to pay or cause the payment otherwise than by Majestic of the repurchase price thereunder, promptly upon the expiration of the initial term of the User Leases"; to pay all taxes (other than Majestic's income tax) pursuant to the transaction; and to "pay or cause to be paid, when due, all debts, liabilities, or obligations (collectively 'Debts'), secured by liens, claims or encumbrances on the Equipment, including without limitation, the Encumbrances."[9] Under the heading "Limited Assumptions," the following appears in the purchase agreement:

Majestic acknowledges that Carena has informed Majestic that the principal financing for purchase of the Equipment from IBM has been provided by the lessors under the User Leases, that the indebtedness to the lessors is secured by legal title to the Equipment and by a right to receive rentals due from users of the Equipment and that Majestic is acquiring the Equipment subject to the title of the lessors and to the right of lessors to receive rentals under User Leases. On or before each December 31 through 1984 Majestic will deliver to Atlantic an assumption agreement in favor of lessors in the form attached as Exhibit B of the following amounts payable to lessors in the subsequent year with respect to Equipment purchased hereunder:[10]

| | |
|---|---|
| Dec. 31, 1979 | $60,000 |
| Dec. 31, 1980 | 300,000 |
| Dec. 31, 1981 | 232,000 |

---

[9] The purchase agreement defines the "Encumbrances" as "the rights and interests under (a) the User Leases, of the parties thereto, and (b) the Residual Agreement[s], of the lessor[s] under the User Leases." The "Debts" are defined to include "all sums payable by lessees under the User Lease[s] or subsequent leases covering the Equipment, with respect to which a residual agreement has been entered into, and all sums payable pursuant to such residual agreement, whether or not such sums are payable solely upon the exercise of any purchase or other option thereunder."

[10] A later document, purporting to be the first annual assumption, makes it clear that the "amounts payable to lessors" referred to above are the lessees' obligations under the user leases. See p. 197 *infra*.

Dec. 31, 1982 ..................... $212,000
Dec. 31, 1983 ..................... 200,000

The provision for Majestic's assumption was included in the purchase agreement for purposes of complying with the at-risk requirements in the Internal Revenue Code of 1954, as amended.

The nonrecourse note in the amount of $1,905,053,[11] referred to in the purchase agreement and executed by Majestic on December 26, 1979, provides for interest of 12 percent annually and equal semiannual payments of interest and principal of $158,206 commencing July 1, 1980, with the last payment to be made on January 1, 1991. The note may be prepaid in whole or in part, without penalty, at any time. Carena "agrees to look solely and only to the Equipment and the rights and interests transferred by [Carena] to [Majestic] pursuant to the Purchase Agreement for the payment, performance and observance of all of the obligations of [Majestic], hereunder and [Carena], for itself and its successors and assigns, hereby expressly waives any rights to enforce payment or performance by [Majestic] * * * or its * * * partners." The security agreement referred to in the purchase agreement and in the nonrecourse note, and executed by Carena and Majestic on December 26, 1979, grants to Carena a security interest, subject to the "Encumbrances," see note 9 *supra*, in—

(a) the interest of [Majestic] in the Equipment and all additions, attachments, accessions and replacements thereto, wherever located and whenever owned or acquired, and all proceeds therefrom, (b) all rentals or other monies payable to [Majestic] under the lease [with Carena] or in connection therewith and (c) all other agreements providing for the sale, lease (including, without limitation, [Majestic's] interest in the User Lease[s] and Residual Agreement[s] referred to in the Purchase Agreement) or other disposition of the Equipment, or its use, and all proceeds and products therefrom (collectively, the "Collateral").

Carena agrees to "look solely and only to the Collateral for the payment and performance" of Majestic's obligations under the note and agreements.

---

[11] The note appearing in the record herein is in the amount of $1,905,054, the $1 difference being neither explained nor material.

Also on December 26, 1979, Majestic and Carena executed an agreement of lease, whereby Majestic leased its interest in the equipment back to Carena through December 31, 1990. The agreement fixes rental payments at $158,206 semiannually, commencing July 1, 1980, with the last payment being due on January 1, 1991. In addition, beginning January 1, 1987, Carena is to pay Majestic "Contingent Rent" in the amount of the following percentages of rentals received by Carena under subleases of the equipment, less any remarketing expenses:

| | |
|---|---|
| 1987 | 30 percent |
| 1988 | 40 percent |
| 1989 | 50 percent |
| 1990 | 50 percent[12] |

Under the agreement, Carena bears the risk of loss of the equipment, must maintain and insure the equipment, and must protect and defend Majestic's "title" and interest in the equipment "from and against any and all claims, liens, charges, encumbrances and legal processes of [Carena's] creditors or other persons having claims against [Carena] or the Equipment." Additionally, Carena is given the right to sublease the equipment during the term of the agreement of lease to the lessees under the user leases and, after the completions of the initial lease terms, to any party within the United Kingdom. With the prior written consent of Majestic, which consent is not to be unreasonably withheld or delayed, Carena may agree to modifications and extensions of the user leases and may enter subleases for the equipment having terms extending beyond December 31, 1990.

On December 26, 1979, Majestic executed (1) a nominee agreement whereby it "acknowledges that it holds all rights to the equipment and the lessor's interest in the lease 97 percent for Majestic's account and 1 percent for the account of each of Arlette Coleman, Carol Coleman and Nancy Coleman," the wives of the Coleman brothers, and (2) a

---

[12] We note that the agreement of lease, apparently as a result of a typographical error, states that "lessor shall pay lessee" these percentages of rentals. Additionally, although the documents would seem literally to require European to allow Carena 30 percent of the 1987 subrental proceeds and Carena to pay Majestic 30 percent of the 30 percent it retained, the context indicates that Carena is to pay over to Majestic the full 30 percent allowed to Carena as between Carena and European. The same analysis applies to the 1988 through 1990 subrentals and the percentages applicable thereto.

letter to Atlantic, European, and Carena in which Majestic acknowledges, inter alia, that none of the three companies had made any representation concerning its ability to sublease the equipment, the possible rentals receivable after the completion of the initial terms of the leases, or the value, if any, that the equipment will have after December 31, 1990.

By letter to Atlantic dated December 31, 1979, Majestic stated: "Pursuant to our agreement with Carena, we hereby assume payment of lessees' obligations to lessors to you relating to Equipment we have purchased falling due during January 1, 1980 through December 31, 1980 to the extent of $60,000.00. * * * We shall not be required to make any payment hereunder until lessors have exhausted all their remedies against lessees and the Equipment (including sale). We will pay such amount as we are liable to pay lessors hereunder in ten equal installments without interest on each January 1 following determination of the amount of our liability."

The $66,176 portion of the $2,055,553 purchase price stated in the purchase agreement was paid 97 percent by Majestic's check, dated December 26, 1979, for $64,190.72, and 1 percent by petitioner Nancy Coleman's check, also dated December 26, 1979, for $661.76. The two recourse notes, required by the purchase agreement to be delivered to Carena, were, by agreement of December 26, 1979, sold by Carena to the Coleman Capital Corporation Employees Profit Sharing Trust for their discounted value of $44,117. Baker was both a trustee and a beneficiary of such trust. Leopard requested the discounting because of his concern about Majestic's credit. The note having a due date of July 1, 1980, and a face amount of $60,160 plus interest of $5,053 was paid 97 percent by Majestic's check, drawn to Baker's order and dated July 1, 1980, for $63,256.61, and 1 percent by petitioner Nancy Coleman's check, drawn to Baker's order and dated June 30, 1980, for $652.13. The note having a due date of January 3, 1981, and a face amount of $24,064 plus interest of $1,444 was paid 97 percent by Majestic's check, drawn to Baker's order and dated January 2, 1981, for $24,742.76, and 1 percent by

petitioner Nancy Coleman's check, drawn to Baker's order and dated December 30, 1980, for $255.08.[13]

During the years in issue, the used computer market was volatile. IBM was the dominant supplier of computer equipment to the leasing companies, and its product announcements and introductions had a major impact on used computer values. IBM introduced the first models of the System 370, the series to which the processors involved in the instant transaction belong, in 1971. The System 370 was a half-generation step up from the System 360, which, first installed in 1965, was the first integrated family of computer models, allowing upgrades without major reinvestments in peripherals and software. The 370/135 (or 3135) model was introduced in 1971, as initial deliveries of the System 370 were taking place. The 370/138 (or 3138) processor, introduced in 1976, offered a 29- to 36-percent increase in performance, and a 42-percent price cut, over the 3135, and thus effectively replaced the 3135 model on the market. In April 1977, the 303X series of processors was introduced as an interim upgrade in the System 370 series. However, the most profound effect on the market came in January 1979, when IBM announced the 4300 series in the United States and United Kingdom. The 4300 was roughly comparable to the 3135 processor in power, but its announced purchase price was 25 percent of that of the 3135, and maintenance and power costs were expected to be significantly less. Additionally, IBM drastically reduced the price of memory on the 4300 series, and offered an attractive 2-year lease plan.

The peripheral market was less volatile. The 1403-Nl printer was introduced to the market in 1965, and has become a most popular, durable item for IBM. The 3330-l disk drives were first installed in 1971, and the 3350 direct access storage devices were first delivered in 1976.

Residual values of computer equipment depend on the age and type of the equipment being evaluated. Because the physical qualities of a particular computer remain new due to the replacement of modular units under a maintenance contract, the technological age of the equipment is more

---

[13] Presumably, the remaining 2 percent of the obligations was paid by the wives of William and Harvey Coleman, each of whom had a 1-percent interest in the transaction.

important than its physical age; computer obsolescence is less a matter of physical depreciation than of technological innovation. Thus, valuation is based on the announcement and installation dates of the model, rather than the manufacture date of the actual machine in question. Moreover, because peripherals are generally more mechanical than they are electronic, technological obsolescence is less rapid for peripherals than for processors. Generally speaking, then, technological innovations decrease peripheral values less than they do processor values.

The markets for used computers in the United States and the United Kingdom involve the same IBM models, but are somewhat different. Computer equipment for the United Kingdom is manufactured for 50-cycle current, while U.K. equipment is manufactured for 60-cycle current. Prices are different in the two countries due to exchange-rate fluctuations and decisions by IBM to cut prices in one country and not the other. Moreover, tax considerations and availability of capital make the leasing business in the two countries somewhat different. However, the markets have recently tended to behave in a more similar manner than in the 1960's and early 1970's. For example, recent product announcements have been simultaneous in the two countries, and dealers have been shipping equipment across the Atlantic Ocean to take advantage of price disparities between the United States and the United Kingdom. It is now possible economically to adapt 50-cycle machinery to 60-cycle current, and vice versa. While shipping, packing, insurance, and the electricity adaptation have a cost, the overseas shipment potential operates to keep IBM from setting widely disparate prices (as a ratio to list price) in the two countries. Generally speaking, residual values in the United Kingdom, as a percentage of list price, track those in the United States.[14]

---

[14] There is evidence of some market for used computer equipment in Western Europe and the so-called southern-tier countries in Europe; however, on the record herein, that market cannot be quantified even in macro terms. Moreover, the record herein is unclear as to whether the re-leasing of the equipment outside the United Kingdom was authorized under the various agreements. See pp. 193, 196-197 *supra.*

OPINION

Respondent has mounted a broad attack on petitioners' depreciation and interest deductions relating to certain computer leasing arrangements. Because we are satisfied that the issue of the deductibility of these two items can be resolved within a relatively narrow framework, we see no point in articulating each of the grounds of respondent's attack. We also observe that we have reached our conclusions herein irrespective of the location of the burden of proof, which is upon petitioners with respect to the original deficiencies and upon respondent with respect to the increased deficiencies set forth in his amended answer. To put the matter in a different frame, our holding herein is that, based upon the entire record,[15] petitioners have failed to carry their burden of proof as to the original deficiencies while respondent has, without the benefit of any presumption of correctness, made a prima facie case to sustain the increased deficiencies, and petitioners have failed to produce sufficient countervailing evidence to produce an equilibrium in respect of that prima facie case. See concurring opinion in *Llorente v. Commissioner*, 74 T.C. 260, 273 n. 2 (1980), modified on other grounds 649 F.2d 152 (2d Cir. 1981).

As we see it, the threshold question is whether petitioners had, during 1979 and 1980, a depreciable interest in the equipment. Respondent, taking the leasing arrangements at face value, contends that the lenders, rather than Atlantic, were the owners of the equipment, and concludes that, since Atlantic would thus not be considered as having a depreciable interest, it follows that petitioners, whose interest is derived from that of Atlantic, are not entitled to deductions for depreciation. Petitioners counter with the assertion that the leasing arrangements were nothing more than financing arrangements, with the result that Atlantic was, in substance, the owner of the equipment and thus of a depreciable interest therein, which petitioners in turn acquired by virtue of the transfer to them via European and Carena.

---

[15] There is no requirement that we are limited to considering respondent's affirmative evidence in determining whether he has carried his burden of proof. Cf. *Imburgia v. Commissioner*, 22 T.C. 1002, 1014 (1954). See also *Clark v. Commissioner*, 266 F.2d 698, 717 (9th Cir. 1959).

Petitioners rely heavily upon *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), and *Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252 (1939), to sustain their position—the former because of its doctrine that the determination as to who is entitled to depreciation turns upon an analysis of all the facts relating to the location of the benefits and burdens of ownership, the latter because it adopts the principle that the location of legal title is not in and of itself determinative in respect of the right of depreciation. We have no quarrel with the proposition that the general principles of *Frank Lyon* and *Lazarus* apply to the instant case. Cf. *Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985). We part company with petitioners insofar as they contend that these cases require a decision in their favor.

A significant element in determining ownership is the location of title to the property. It cannot be gainsaid that the documentation herein shows that title to the equipment was unconditionally vested in the lenders. Indeed, that result was intended by the parties, i.e., Atlantic and the lenders, not only in form but also in substance in order to achieve the unquestioned objective of providing the lenders with a first year tax deduction of the cost of the equipment under U.K. law. Thus, under U.K. tax law, Atlantic did not have ownership of the equipment. Such being the case, the question arises as to the extent to which petitioners herein can disavow the form of the transaction between Atlantic and the lenders in order to sustain their right to depreciation under U.S. tax law, since it seems clear to us that the sine qua non of petitioners' depreciable interest in the taxable years before us is the existence of a depreciable interest in Atlantic.[16]

We think it important to note that, in the instant case, it is the taxpayer and not the Government which seeks to disavow the form of the transaction. As we observed in

---

[16] It is not clear to us on the record herein that it would necessarily follow from a determination that Atlantic was the owner of the equipment for purposes of depreciation during 1979 and 1980, that the various agreements between Atlantic, European, Carena, and Majestic transferred that ownership interest to Majestic. However, for purposes of decision herein, we have ignored the gaps which we perceive in the record in this regard and assumed that any such ownership interest was in fact transferred to Majestic. Indeed, we have ignored the intervention of European and Carena and have assumed that the sale and leaseback herein were, in effect, between Majestic and Atlantic.

*Bolger v. Commissioner*, 59 T.C. 760, 767 n. 4 (1973): "the taxpayer may have less freedom than the Commissioner to ignore the transactional form that he has adopted." (Citations omitted.) See also *Bradley v. United States*, 730 F.2d 718, 720 (11th Cir. 1984); *Sullivan v. United States*, 618 F.2d 1001, 1007 (3d Cir. 1980); *Spector v. Commissioner*, 641 F.2d 376, 381 (5th Cir. 1981), revg. and remanding 71 T.C. 1017 (1979). We think this is particularly true where, as is the case herein, the form of the transaction was adopted by Atlantic and the lenders in order to achieve a bona fide, permissible tax purpose. Cf. *Strick Corp. v. United States*, 714 F.2d 1194 (3d Cir. 1983); *Strong v. Commissioner*, 66 T.C. 12 (1976), affd. without published opinion 553 F.2d 94 (2d Cir. 1977). See also *Ourisman v. Commissioner*, 760 F.2d 541 (4th Cir. 1985), vacating and remanding 82 T.C. 171 (1984). Furthermore, the ability of a taxpayer to avoid the consequences of the form of a transaction is even more restricted in the Third Circuit Court of Appeals to which an appeal in this case would lie. *Sullivan v. United States, supra,* which extended the rule of *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967), revg. and remanding 44 T.C. 549 (1965). Finally, it is clear that the "strong proof" rule followed by this Court and the more restrictive rule of *Danielson*,[17] apply beyond the confines of allocating payments to a covenant not to compete. *Sullivan v. United States, supra* at 1007; *Bradley v. United States, supra; Spector v. Commissioner, supra; Miami Purchasing Service Corp. v. Commissioner*, 76 T.C. 818, 830 (1981) (where did title pass from taxpayer to buyer); *Stephens v. Commissioner*, 60 T.C. 1004 (1973), affd. without opinion 506 F.2d 1400 (6th Cir. 1974) (whether taxpayers were legally obligated to buy stock).[18] The fact

---

[17] *Danielson* rejected the "strong proof" standard, to which this Court still adheres (see *O'Callaghan v. Commissioner*, T.C. Memo. 1984-214), in favor of a rule that a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement "would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." See *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967), revg. and remanding 44 T.C. 549 (1965).

[18] Our suggestion in *Rochester Development Corp. v. Commissioner*, T.C. Memo. 1977-307, that neither the *Danielson* rule nor the "strong proof" rule applied in determining whether a transaction involved a sale or lease was made in the context of a decision which did "not involve an attempt by petitioner to vary the undertakings set forth in the written agreements."

that the purpose underlying the form of the transactions between Atlantic and the lenders was to take advantage of U.K. rather than U.S. tax laws does not, in our opinion, provide a sufficient foundation for permitting petitioners to disavow that form 'in order to obtain the benefits of U.S. tax laws. Similarly, we consider it irrelevant that Atlantic and the lenders were apparently not subject to U.S. tax laws. Rather, we think our decision herein should be based upon the situation which would have existed had both Atlantic and the lenders been subject to U.S. tax laws during 1979 and 1980 and sought to claim depreciation in respect of the equipment. Compare *Rochester Development Corp. v. Commissioner*, T.C. Memo. 1977-307, n. 1.

The bulk of the cases relied upon by petitioners herein involved situations in which the Government was attacking the form of the transaction and the taxpayer was seeking to persuade the Court that the substance and form of the transaction coincided. Certainly this was the posture in *Frank Lyon Co. v. United States, supra*, and *Estate of Thomas v. Commissioner, supra*, and consequently, taking into account other factors to which we will subsequently advert, those cases are readily distinguishable from the situation in the instant case. See *Bradley v. United States, supra* at 720. Moreover, there is nothing in either *Frank Lyon* or *Thomas* which compels us to ignore the form of a transaction structured to obtain tax benefits in one jurisdiction and to restructure the transaction, at the insistence of the taxpayer, in order to confer tax benefits in another jurisdiction—in short, to enable the taxpayer to play both ends against the middle. Although *Helvering v. F. & R. Lazarus & Co., supra*, ostensibly stands for the proposition that a taxpayer can attack the form of a transaction which encompasses the passage of title, there were various other factors present in that case which the Supreme Court considered significant in reaching its conclusion and on which we will subsequently comment. Moreover, we think it important that, in permitting the taxpayer to attack the form of the transaction, the Supreme Court in *Lazarus* did not hold that the location of title was irrelevant. *Bowen v. Commissioner*, 12 T.C. 446 (1949), and *Oesterreich v. Commissioner*, 226 F.2d 798 (9th Cir. 1955), revg. a

Memorandum Opinion of this Court, are similarly factually distinguishable. The same is true of *Bolger v. Commissioner, supra*, where respondent conceded any issue of depreciation based on nonrecognition of the leases. See 59 T.C. at 767.

In light of the foregoing analysis, we conclude that the proper posture of this case is that the unconditional and consistently confirmed vesting of title in the lenders for a bona fide purpose creates a situation in which respondent has made a prima facie case that Atlantic was not the owner of the equipment for purposes of depreciation, and in which petitioners, claiming through Atlantic, should not be in a better position since, under the various agreements, Majestic simply acquired Atlantic's interest in the equipment. In so concluding, we emphasize that we are not holding that Atlantic was not the owner of the equipment, but only that petitioners have the burden of producing, at a minimum, "strong proof" that the other elements of the burdens and benefits of ownership were such that Atlantic should be considered the owner and, additionally, that Majestic assumed such burdens and was entitled to such benefits of ownership with the result that it (and therefore petitioners) should be entitled to depreciate its (and their) investment[19] in the equipment irrespective of any ownership by Atlantic. Absent such "strong proof," petitioners must be held to have failed to carry their burden of proof as to the original deficiencies and respondent must, by virtue of the prima facie case stemming from the location of title, be held to have carried his burden of proof as to the increased deficiencies. Cf. *Whitmer v. Commissioner*, 443 F.2d 170 (3d Cir. 1971), affg. a Memorandum Opinion of this Court. See also Gideon, "Mrs. Gregory's Grandchildren: Judicial Restrictions of Tax Shelters," 5 Va. Tax Rev. 825 (1986). It is to these other elements of the benefits and burdens of ownership that we now turn our attention.

We recognize that, according to the tabulation on page 186, Atlantic obtained some $55,000 less than the original cost of the equipment from the lenders and that this

---

[19] For convenience, we sometimes use Majestic alone as the focal point for purposes of analysis, although a small part of petitioners' interest is separate and distinct from their interest in Majestic. See pp. 196-198 *supra*.

indicates a financing rather than a sale transaction. But, given the difficulties in computing the costs of the equipment to Atlantic, as reflected in the notes to the tabulation on page 186 *supra* (see p. 187 *supra*) and the small magnitude of this differential in relation to the overall cost of the equipment (approximately 3 percent), we are not prepared to attach much significance to this circumstance.[20] Certainly, this differential is a far cry from the approximately 50 percent differential which was present in *Helvering v. F. & R. Lazarus & Co., supra.*

The terms of all the initial leases extended beyond the taxable years involved herein and the leases were net leases, which placed the full responsibility for the equipment and its maintenance, except for wear and tear, upon the lessees. Thus, neither Atlantic nor any entity deriving its interest from Atlantic bore most of the normal burdens of ownership. While we recognize that net leases of the type involved herein are common in the business world and, in and of themselves, do not control the question of who is entitled to depreciation (see *Estate of Thomas v. Commissioner*, 84 T.C. at 433; *Northwest Acceptance Corp. v. Commissioner*, 58 T.C. 836 (1972), affd. per curiam 500 F.2d 1222 (9th Cir. 1974)), we think that, in the context of this case, it is an element that may properly be taken into account in determining whether petitioners had a depreciable interest in the equipment during the years in issue. Moreover, we note that the purchase and sale agreement among Atlantic, European, Carena, and Majestic made clear that Majestic had no responsibility for maintaining or replacing the equipment.

Atlantic had assigned the rents under the leases to the lenders without recourse. Thus, aside from the fact that Atlantic's right to reacquire title to the equipment from the lenders upon the completion of the initial lease terms was conditional on payment by the lessees of all amounts due under such leases, Atlantic had no liability to the lenders for the payment of such amounts prior to undertakings resulting from the transactions involved herein. The first

---

[20] The tabulation on p. 186 *supra* shows that, in the case of some of the equipment, Atlantic got an excess over cost from the lenders, while, with respect to some equipment, Atlantic got less than cost from the lenders. These disparities are unexplained on the record; since the parties attach no importance to these disparities, we do likewise.

time a recourse liability to the lenders on the part of Atlantic could possibly be said to exist would be upon the execution of the purchase and sale agreement, thereby permitting the lenders to be considered third-party beneficiaries of Atlantic's obligations thereunder to pay or cause to be paid the debts encumbering the equipment, including amounts due from the leases. Although such liability was partially offset by Majestic's "assumption" agreement with Carena, we view this as a mere sharing in the newly created undertaking with respect to the rents. At best, the "assumption" was Majestic's guaranty to make good any default by a lessee under an initial lease.[21] Cf. *Brand v. Commissioner*, 81 T.C. 821 (1983). Indeed, Baker's testimony at trial clearly indicates that the "assumption" agreement was designed simply to enable the transaction to meet the "at risk" requirements under section 465.[22] See *Tolwinsky v. Commissioner*, 86 T.C. 1009 (1986); *Law v. Commissioner*, 86 T.C. 1065 (1986). Under the foregoing circumstances, these obligations, in our opinion, do not represent any present investment in the equipment by either Atlantic or Majestic, irrespective of any third-party beneficiary rights that may thereby have been created in the lenders.

---

[21] It is clear to us that the lenders viewed the lessees as financially responsible entities and the equipment as sufficient security that those responsibilities would be duly discharged. We are satisfied that neither Atlantic nor Majestic had any reason to believe otherwise, and that Atlantic simply viewed Majestic's assumption as security for its effective second-mortgage position behind the lenders in the unlikely event that the lessees were to default under their leases. Indeed, Majestic's "assumption" became operative only after all remedies against the lessees and the equipment had been exhausted by the lenders. Moreover, the "assumptions" were to be given in separate amounts year by year, and it appears that the amounts covered by the "assumptions" were to be paid, if at all, over a 10-year period without interest. Clearly, a promise to pay in future installments a liability of another that becomes immediately due and payable can hardly be characterized as anything more than a guaranty.

[22] All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Rules of Practice and Procedure of this Court.

At the trial of the instant case, Baker testified as follows:

"In order to comply with the at-risk requirements, which were introduced about that time, the documents provided—I'm going to say this was done with the at-risk requirements in mind. They could not, in compliance with the statute, assume—assumption of personal liability on the nonrecourse mortgage wouldn't have availed any because the nonrecourse mortgage was held by [Carena]. So, therefore, assumption of liability on that nonrecourse mortgage would not have satisfied the requirements of the statute. Therefore, they undertook to assume a portion of the underlying liability. * * * And they assumed sufficient amounts of that liability to comply with the at-risk requirements."

We do not view the various December 1979 agreements as otherwise establishing any depreciable interest in Atlantic during the years at issue, which could be said to have been conveyed to Majestic. In fact, the structure of those agreements points in the opposite direction. If one looks at the right of Majestic to participate in future rentals, it is obvious that Atlantic continued to have the right to all rentals obtained after the completion of the terms of the initial leases through 1986.[23] After 1986, Majestic was entitled to receive "contingent rent" in amounts of 50 percent or less of such rentals through 1990. Thus, Majestic was a nonparticipant in the rents for several years after the years at issue and then only an "iffy" semi-participant for another 4 years. Certainly the situation herein is a far cry from that which existed in *Estate of Thomas v. Commissioner, supra,* where the parties stipulated that the useful life of the equipment extended at least 3 years beyond the lease terms—a fact which this Court considered quite significant. See 84 T.C. at 433. Under the circumstances, it is difficult to embrace the concept that Majestic's participation in future rentals provides a basis for holding that Majestic had a depreciable interest in the equipment during the taxable years at issue.

Nor do we view the leaseback from Majestic to Carena as indicating that Majestic either held a depreciable interest in the equipment in 1979 and 1980 or made any investment in the equipment beyond the $150,500 it paid in cash and recourse notes for an interest in the residuals at a future date. While we are cognizant that the identity between the amounts of the lease payments by Carena to Majestic and the nonrecourse debt payments by Majestic to Carena does not preclude separate recognition of the lease and the indebtedness (see, e.g., *Estate of Thomas v. Commissioner,* 84 T.C. at 436), we think it appropriate, in the context of determining whether petitioners acquired an interest in the equipment depreciable in 1979 and 1980, to view those

---

[23] Petitioners seek to minimize the impact of this element by arguing that we should view the agreement as transferring all Atlantic's rights to Majestic and then leasing this right back from Majestic. While we have assumed that the transaction constituted a sale and leaseback between Majestic and Atlantic (see note 16 *supra*), we view as mere semantic sophistry the suggestion that the agreements, though literally reserving for Atlantic a right to future income, actually transferred this right to Majestic from Atlantic and then transferred it back to Atlantic.

offsetting payments as canceling each other and therefore properly to be ignored in determining the nature of the acquired interest. In this connection, we note that, in *Frank Lyon*, the obligation of the lessor for whose benefit the rental payments were made to the financing institutions was a *recourse* obligation. While the comparable obligation in *Estate of Thomas* was nonrecourse, there were other factors in that case which make it distinguishable from the case before us (see p. 207 *supra* and note 39 *infra*).

As far as the $150,500 is concerned, this too did not, in our opinion, create an interest depreciable by Majestic during the taxable years at issue. It was clearly paid for the right to participate in the contingent benefits hopefully to be derived from the future use of the equipment at a point of time when that use was at best speculative in view of the maximum residual value of the equipment.[24] See p. 212 *infra*.

On the basis of all of the above, and of the entire record herein, we hold that Majestic, and thus petitioners, did not own an interest in the equipment depreciable in 1979 and 1980. It may well be that the interest will ripen into a depreciable interest, perhaps as early as 1987, but this is an issue which we need not and do not decide. See and compare *Geneva Drive-In Theatre, Inc. v. Commissioner*, 67 T.C. 764, 770-774 (1977), affd. per curiam 622 F.2d 995 (9th Cir. 1980); *Davis v. Commissioner*, 66 T.C. 260 (1976), affd. 585 F.2d 807 (6th Cir. 1978); *Commissioner v. Moore*, 207 F.2d 265, 268-269, 271-272 (9th Cir. 1953), revg. 15 T.C. 906 (1950); *Fox River Paper Co. v. Commissioner*, 28 B.T.A. 1184, 1203-1204 (1933); sec. 167(h); see also Rev. Rul. 60-180, 1960-1 C.B. 114; Note, "Purchaser's Depreciation Rights in Property Subject to a Lease," 82 Mich. L. Rev. 572, 582-588 (1983). But cf. *Wagner v. Commissioner*, 518 F.2d 655 (10th Cir. 1975), revg. and remanding a Memorandum Opinion of this Court. In view of this holding, we need not address the other major contentions of the parties relating to the existence of a profit motive under section 183—an element which does not affect the issue of interest

---

[24] We have not taken Majestic's "assumption" into account for the reasons previously stated. See p. 206 *supra*.

deductions to which we now turn our attention. See sec. 183(b)(l).

The next issue for decision is whether respondent properly disallowed petitioners' deduction of interest on the nonrecourse note. Section 163(a) provides for the deductibility of "all interest paid or accrued within the taxable year on indebtedness," and it is well established that deductible interest is a payment for the use or forbearance of money. *Deputy v. du Pont*, 308 U.S. 488, 497 (1940); *Smith v. Commissioner*, 84 T.C. 889, 897 (1985). It is also well settled that the "indebtedness" referred to in section 163(a) must be a *genuine* indebtedness. *Knetsch v. United States*, 364 U.S. 361 (1960); *Elliott v. Commissioner*, 84 T.C. 227, 244 (1985), affd. 782 F.2d 1027 (3d Cir. 1986). While transactions such as petitioners' generally receive scrutiny on this score due to the "obvious opportunities for trifling with reality"(*Elliott v. Commissioner, supra* at 244), neither the nonrecourse note nor the use of the sale-leaseback device in which rent payments are geared to interest and amortization on the note necessarily deprives the debt of its character as genuine indebtedness able to support an interest deduction. See *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Hilton v. Commissioner*, 74 T.C. 305, 348 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982). However, where, in such situations, the purchase price and principal amount of the nonrecourse note unreasonably exceed the value of the property interest acquired,[25] it is settled that no genuine indebtedness exists. *Estate of Franklin v. Commissioner, supra* at 1049; *Elliott v. Commissioner, supra* at 245; *Odend'hal v. Commissioner*, 80 T.C. 588, 616 (1983), affd. on this issue 748 F.2d 908 (4th Cir. 1984). This is true because "the debt has economic significance only if the property substantially appreciates in value prior to the date at which a very large portion of the purchase price is to be discharged." *Estate of Franklin v. Commissioner, supra* at 1049. The economics of such a transaction, then, are such that only a potential that a genuine indebtedness may arise

---

[25] Compare *Brannen v. Commissioner*, 78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (llth Cir. 1984) (purchase price) with *Hager v. Commissioner*, 76 T.C. 759, 774-775 (1981) (principal amount). See also *Elliott v. Commissioner*, 84 T.C. 227, 245 n. 5 (1985), affd. 782 F.2d 1027 (3d Cir. 1986).

exists, and thus that the purchaser has not secured the requisite "use or forbearance of money." *Estate of Franklin v. Commissioner, supra* at 1049.

The starting point of our analysis is the residual value of the equipment, i.e., the value of the interest acquired. The parties' expert witnesses at trial varied widely in their estimates of residual value. Each purporting to rely only on knowledge available in 1979, respondent's experts, Dee Morgan and S. Paul Blumenthal, predicted 1987 values of $13,000 and $37,500, respectively, whereas petitioners' experts, Davies and David McCormick, predicted 1987-91 values of Majestic's interest in the equipment totaling $393,023 and $337,941, respectively. Based upon the totality of the testimony and expert reports, we find that, of the parties' expert witnesses, McCormick was the most knowledgeable about the U.K. computer leasing market, prepared the clearest, most systematic analysis of the value of Majestic's interest in each of the years 1987-91, and was generally the most convincing. Thus, we begin our analysis of the value of the interest purchased by Majestic with McCormick's figures.

McCormick, the president of ICA Europe, a computer leasing company that competes with Atlantic, estimated the equipment's residual values, in terms of percentages of the 1979 IBM prices, as follows:

| Lease | 1987 | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|---|
| (1) Reuters | 10 | 0 | 0 | 0 | 0 |
| (2) Northumberland | 10 | 0 | 0 | 0 | 0 |
| (3) Thomson Travel | 0 | 0 | 0 | 0 | 0 |
| (4) Torrington | | | | | |
| Processor | 0 | 0 | 0 | 0 | 0 |
| Printer | 23 | 23 | 20 | 20 | 10 |
| (5) Cheshire | 35 | 35 | 25 | 25 | 15 |
| (6) Cheshire | 20 | 20 | 10 | 10 | 10 |
| (7) Cheshire | 40 | 40 | 30 | 30 | 20 |
| (8) C & J Clark | 25 | 25 | 20 | 20 | 10 |

By our calculation, given Majestic's contractual percentages of the 1987-90 rentals, McCormick's assertions as to 1979 IBM prices, and an exchange rate of $2.216/£,[26] Mc

---

[26] As is obvious in 1986, when the exchange rate is approximately $1.55/£, this rate turns out to be totally unrealistic. In the absence of a more reasonable indication of the predicted future exchange rates that would have been used by an objective analyst in December 1979, however, we use $2.216/£ in our calculation.

Cormick's residual percentages result in cash-flows to Majestic as follows:

| 1987 | 1988 | 1989 | 1990 | 1991 | Total |
|------|------|------|------|------|-------|
| $44,732 | $41,523 | $37,083 | $37,083 | $115,443 | [27]$275,864 |

An objective analysis of the totality of the record leads us to conclude that even this lower estimate of the value of Majestic's interest is substantially skewed upward. Mc Cormick testified that he based his estimates of residual value primarily on two factors: (1) The historical value of IBM equipment, and (2) Atlantic's position in the U.K. leasing market. With regard to the first of these factors, we find that, while McCormick's testimony that the longevity of the earlier System 360 processors and 2311 disk drives made it reasonable in 1979 to predict that the processors would last 10 years and the peripherals 15 years, was internally logical, McCormick failed sufficiently to take into account the 1978 announcement rumors and IBM price cuts as to disk drives and, more importantly, IBM's January 1979 announcement and late-1979 delivery of the 4300 series. To be sure, some skepticism as to the magnitude of the 4300's price-performance improvement over the System 370 models appears to have been warranted. But, given the experts' testimony and reports, we find that McCormick focused excessively on the historical data and insufficiently on the objective indicia in 1979 of a severe flattening of the market for the processors and peripherals comprising the equipment. We conclude that, *at a minimum*, McCormick's figures (as corrected) must be reduced by a factor of 20 percent on this ground.

With regard to the second factor—Atlantic's market position—we find we must again discount McCormick's figures. McCormick's testimony emphasized that Atlantic's unique position in the leasing market allows it to derive higher residuals than are generally obtainable from computer equipment.[28] The testimony of Davies and McCormick

---

[27] We note that respondent, correcting McCormick's mathematical errors, arrived at a total value of $274,682, and that our calculation further corrects the parties' errors.

[28] For example, McCormick testified:

"In 1979, whereas a normal company * * * would write a normal contract, say for 3 years or 4 years [or] 5 years [and] might expect to have a 37138 last 8 years from the date of first delivery, in Atlantic's case they well expected [them] to last 10 years because they had a

indicates that this advantage translates into residual values for Atlantic that are 20 percent higher, and equipment lives that are 25 percent longer, than the average in the brokers' market. To be sure, based upon our assumptions as to the proper parties to the sale-leaseback transaction (see note 16 *supra*), Atlantic stood to benefit from the re-leasing of the equipment after the expiration of the initial terms, either from the right to retain 100 percent of the rents therefrom or a 70 percent to 50 percent share through 1990 (see p. 192 *supra*). But by that time, Atlantic's debt to the lenders and undertaking to Carena will presumably be completely satisfied (see note 21 *supra*), so that Atlantic's obligation to pay the rentals due from the initial leases could hardly be said to constitute a means of prodding Atlantic to engage in releasing activities. Nor, given the other evidence of record, are we persuaded that, whatever Atlantic's unique position may have been, it would have or could have successfully utilized that position as McCormick testified. Baker, at best, gave the back of his hand to the elements of contingent rentals and residual value. See p. 185 *supra*. Consequently, to the extent that McCormick took Atlantic's remarketing ability into account in deriving his estimates, such estimates are too high. We are satisfied that a further reduction of McCormick's figures by a factor of *at least* 20 percent is appropriate.

Thus we conclude that, in his calculations, McCormick erred by adding at least 40 percent to the proper 1979 estimate of the value of Majestic's interest in the equipment. Accordingly, we are left *at the very most* with the following cashflows and total residual value for Majestic:

| 1987 | 1988 | 1989 | 1990 | 1991 | Total |
|------|------|------|------|------|-------|
| $31,951 | $29,659 | $26,488 | $26,488 | $82,459 | [29]$197,045 |

customer base tied in, because they had an outstanding relationship with that customer base, and they had a very, very good reputation in the market."

[29] Here, again, the instant situation is significantly different from that which existed in *Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985), where the parties stipulated to a residual value of at least 14 percent based on original cost. See 84 T.C. at 429. We are constrained to note that the factual foundation for the above numerical findings may be too favorable to petitioners, at least to the extent that it rests on an implied finding that the equipment subject to the initial leases will have useful lives extending beyond 1986.

Without question, this *maximum value* of Majestic's interest of $197,045, when compared with either the $2,055,553 stated purchase price or the $1,905,053 nonrecourse note, establishes that the price and note unreasonably exceed the value of the interest acquired by Majestic. See, e.g., *Elliott v. Commissioner*, 84 T.C. at 246 (maximum value of $7,800, note for $198,000, price of $235,000); *Fuchs v. Commissioner*, 83 T.C. 79, 102 (1984) (maximum value of $42,000, note for $687,500, price of $812,500); *Dean v. Commissioner*, 83 T.C. 56, 78 (1984) (maximum value of $58,500, note for $742,500, price of $877,500); *Odend'hal v. Commissioner*, 80 T.C. at 617 (maximum value of $2 million, note for $3,920,000, price of $4 million). Thus, respondent correctly disallowed petitioners' deductions for interest on the nonrecourse note.[30]

Finally, we hold that the interest on the *recourse* promissory note paid by Majestic and petitioner Nancy Coleman in 1980 is deductible under section 163(a). It is clear that petitioner Nancy Coleman deducted her share of such interest on her 1980 return, and we presume that the interest deducted on Majestic's 1980 return includes its share of the interest on the recourse note. Additionally, although he appears to have disallowed deductions for such interest in the deficiency notice, respondent does not argue in this proceeding that such interest was not properly deducted. From all that appears in the record herein, the note was genuine, recourse indebtedness, and the interest paid thereon in 1980 is thus deductible. In order to account for the allowance of these deductions,

*Decision will be entered under Rule 155.*

---

[30] We note that this analysis also provides further support for our holding that, at the very least, the bulk of the depreciation deductions herein were properly disallowed. See, e.g., *Odend'hal v. Commissioner*, 748 F.2d 908, 912 (4th Cir. 1984), affg. on this issue 80 T.C. 588 (1983); *Brannen v. Commissioner*, 722 F.2d 695, 701 (11th Cir. 1984), affg. 78 T.C. 471 (1982); *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1048-1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975). In this connection, we further note that our decision in *Estate of Thomas v. Commissioner, supra,* emphasized that it was stipulated and proved that the equipment had substantial value beyond the terms of the leases subject to which the taxpayer acquired such equipment.