NEAL H. LEVINE, AND ESTATE OF GAIL L. LEVINE, NEAL H. LEVINE, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; HARRY H. EPSTEIN AND MARIAN EPSTEIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Levine v. Commissioner
Dockets Nos. 11611-81; 11613-81; 6949-83; 6950-83; 34842-83; 10937-84.
United States Tax Court
T.C. Memo 1987-606; 1987 Tax Ct. Memo LEXIS 651; 54 T.C.M. (CCH) 1277; T.C.M. (RIA) 87606; December 10, 1987. *651 Held: Purchases of herds of cattle not recognized for tax purposes; fraud addition not proven. Jose Garcia-Pedrosa, *652 Robert Rubenstein, Jeffrey Frantz, for the petitioners. James Clark, Avery B. Cousins III, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies and additions to tax under section 6653(b)[1] against petitioners Neal H. Levine and the Estate of Gail L. Levine (docket Nos. 11611-81, 6950-83, and 10937-84) for the years 1970 through 1980, both inclusive, in the following amounts: Addition to Tax
Year
Deficiency
Section 6653(b)
1970
$ 20,198.00 $ 10,457.00
1971
27,449.00
13,725.00  1972
83,414.00
41,707.00  1973
128,058.00
64,029.00  1974
100,958.00
50,479.00  1975
78,499.00
39,250.00  1976
36,507.00
18,254.00  1977
47,368.00
23,684.00  1978
41,868.00
20,934.00  1979
36,003.00
18,002.00  1980
37,276.48
18,638.24  Respondent also determined deficiencies and additions to tax under section 6653(b) against *653 petitioners Harry H. Epstein and Marian Epstein (dockets Nos. 11623-81, 6949-83, 34842-83) for the years 1972 through 1980 in the following amounts: Addition to Tax
Year
Deficiency
Section 6653(b)
1972
$ 184,986.00
$ 92,493.00
1973
117,264.00
58,632.00  1974
176,728.00
88,364.00  1975
119,126.00
59,563.00  1976
86,232.00
43,066.00  1977
61,893.00
30,947.00  1978
42,805.00
21,403.00  1979
27,392.00
14,115.00  1980
26,286.00
13,143.00  The deficiencies are predicated upon a number of different adjustments determined against each set of petitioners. In addition, petitioner Neal H. Levine (Levine) and petitioner Harry H. Epstein (Epstein) each contend that their respective wives were innocent spouses, and Levine claims overpayments for each of the years 1969, 1970, 1971, 1973, and 1978. However, the only issues to be determined in this proceeding arise out of the purchase by Levine and Epstein, in various years, of herds of cattle from Southern Star Land and Cattle Co., Inc. (Southern Star) as a result of which Levine and Epstein in each of the above-listed years claimed deductions, and for some years investment *654 tax credits, all of which were disallowed by respondent in the statutory notices. Respondent's determination of fraud against Levine and Epstein is also predicated on the Southern Star transactions. [2] Respondent has also conceded that if respondent is sustained with respect to the deficiencies based on the Southern Star transactions, petitioners may exclude from income the income reported as received from alleged sales of cattle to and by Southern Star for the accounts of Levine and Epstein, respectively. [3]
*655 This Court has issued opinions with respect to other investors in southern Star's cattle programs in all of which we have found that the purported sales of cattle were lacking in economic substance and that the benefits and burdens of ownership were not transferred to the respective taxpayers. See Cherin v. Commissioner, 89 T.C.    (Nov. 23, 1987); Jacobs v. Commissioner,T.C. Memo. 1985-609; Siegel v. Commissioner,T.C. Memo. 1984-441; Hunter v. Commissioner,T.C. Memo. 1982-126. In none of these cases was the addition to tax for fraud determined against the taxpayers. Therefore, while the facts in these consolidated cases are essentially the same as in the decided cases, the record in these cases is substantially more voluminous and we have concluded that it is necessary to make complete findings of fact rather than to incorporate findings of fact made in the previously decided cases. FINDINGS OF FACT
General
At the time of the filing of the petitions in docket Nos. 11611-81, 6950-83, and 10937-84, petitioners Levine resided in Miami, Florida. We assume that the Estate of Gail L. Levine has its situs *656 in Miami, Florida. At the time the petitions were filed in docket Nos. 11613-81, 6949-83, and 34842-83, Epstein resided in Florida, and Marian Epstein resided in New York. All of the Federal income tax returns for each of the years here involved were filed jointly by each set of petitioners on a calendar-year, cash-receipts basis. Levine received a bachelor's degree in business administration in 1963 from the University of Miami, and in 1964 he became a certified public accountant. He practiced as a certified public accountant in Miami, Florida, until well after the formation of Southern Star. During the course of his practice he advised clients from time to time with respect to potential investments including the Federal tax aspects of such matters. He participated in the preparation of Federal income tax returns including his own returns and was familiar with Federal tax laws as they pertain to investments in cattle. Epstein graduated from the State University of New York in January 1952 with an associate degree in advertising. From approximately 1954 until approximately 1973 or 1974 he was engaged in the advertising business in New York, owning in the later years a New *657 York City advertising agency. At a point in time unknown but prior to the year 1968, Black Watch Farms, from a headquarters cattle farm operation in New York State, commenced a program of selling herds of cattle to investors. By 1968 Black Watch Farms had become a dominant factor in the investor cattle market with operations in a number of states. In January or February 1968, Epstein, who had heard about Black Watch Farms from a friend and had made one trip to see the farm and to see its bull allegedly worth $ 1 million, purchased one or more herds. However, he became dissatisfied with the cattle program and in March 1968 persuaded the management of Black Watch Farms to repurchase his herd of cows. Nevertheless, this experience served to create in Epstein a strong interest in the cattle business. Subsequent to the date of Epstein's purchase of a Black Watch Farms' herd, the Security & Exchange Commission (SEC) issued a cease and desist order, prohibiting the continued sale of Black Watch Farms of its cattle herds until the program had been registered with the SEC. At least in part as a result of the issuance of the cease and desist order, Black Watch Farms went into bankruptcy. *658 At about the same time, Irwin Gars, a Miami, Florida lawyer, heard about Black Watch Farms and its troubles and during the pendency of the bankruptcy proceedings, helped to form a committee of herd owners. Levine, in some fashion, also became aware of Black Watch Farms. As a result of the bankruptcy proceedings, many of the investor cattle were not getting proper care and in some cases the trustee in bankruptcy required investors to move their cattle. Thus the opportunity to take over management of some of the investor-owned Black Watch Farms' cattle and possibly to purchase some cattle from Black Watch Farms became known to Gars, Epstein, and Levine. The three of them determined to commence a business operation under the name of Southern Star, both to manage cattle and to engage in the real estate development business, which was a strong interest of Gars. Southern Star was organized in 1970 by these three individuals. In that year it purchased a tract of land in or near Citra, Florida, suitable for a cattle ranch, and almost immediately started moving on to the Citra ranch Black Watch Farms' cattle. Because Levine and Epstein wished to concentrate on cattle ranching and Gars *659 was primarily interested in real estate development, Levine and Epstein agreed to and did buy out Gars' interest in Southern Star in October 1971. Also during 1971, Southern Star acquired and commenced operating a ranch in Cassoday, Kansas, and in 1973 a third ranch in Elkland, Missouri, was acquired. With the purchase of Gars' interest, Levine and Epstein became the sole shareholders, the directors, and principal officers of Southern Star, with Levine acting as it chief executive officer. Southern Star opened its Miami office in the fall of 1971. From its inception, southern Star appears to have been undercapitalized and to have been constantly in need of funds. Most of its initial financing was provided by Gars and Epstein and by bank loans. However, Southern Star sought to obtain needed working capital from sales of herds to investors and from cash provided by management fees paid by investors. Levine gradually withdrew from his accounting business in order to devote time to Southern Star's activities and by sometime in 1973 his principal, if not sole business operation, was Southern Star. For several years after the incorporation of Southern Star, Epstein continued his *660 advertising business in New York, although he visited the ranches owned by Southern Star, promoted the sale of herds to investors, and participated in various purchases of cattle by Southern Star either for its own account or for resale to investors. Because of marital difficulties, Epstein finally left New York in July 1977 and moved to Florida, and in January 1978 he started to work in the Miami office of Southern Star. The objective of Southern Star was to develop a large herd of purebred Aberdeen Angus cattle registered with the American Angus Association (Association) in its name as the apparent owner, small units of which would be sold to investors at least in part as a means of raising operating capital. For a period of time the emphasis partially turned to the breeding of so-called "exotic" cattle, which meant breeding Angus and other cows with bulls from foreign strains of cattle, but Levine apparently concluded after some experience with exotic breeds that Southern Star should return to purebred Angus cattle. There was to be continuing emphasis on herd improvement through selective breeding and culling. Both Levine and Epstein looked forward to a high quality operation *661 with one or more prize bulls and cows. However, as with many new businesses, Southern Star encountered many problems, especially during the initial years. When Southern Star commenced business, neither Levine nor Epstein knew enough about the cattle business to be capable of operating such a business. They recognized the need to hire professional ranch management but at least their initial selections were very poor. Southern Star also purchased a large number of cattle from the Black Watch Farms operation to be used as one of the sources of the smaller herds to be sold to investors but these cattle, when they arrived at the Citra Ranch, were in very poor condition. They required an extensive period of time to become acclimated to the Florida climate. In part for this reason the calf production by these cows was poor. In addition the records on these cattle were incomplete. Many of the cattle were either not registered with the Association or the registration was not properly changed into the name of Southern Star. Many, if not most, of the cattle from the Black Watch Farms and other purchases in the early years were of poor quality and were poorly managed in southern Star's *662 hands. Prices paid for the cattle varied but many, if not most, were purchased for less than $ 500 per head. Record keeping at Southern Star was extremely poor during the early years. The cattle assigned to an investor were supposed to be described in a schedule attached to the investor sales agreement by ear tag, Association registration and tatoo numbers, and bo date of birth. However, there were substantial delays in the preparation of the schedules and many problems with cattle assigned to investors. Many cattle were either not registered at all with the Association, possibly reflecting the fact that such cattle were not purebred Aberdeen Angus or reflecting a failure to transfer registration to the name of Southern Star. In the prior decided cases involving the Southern Star cattle program, there were many instances where, for these reasons the cattle assigned to an investor's herd did not comply with the provisions of the sales agreements. Some of the herds purchased by Levine and Epstein suffered similar problems. However, Southern Star's management practices as well as its record keeping and inventory controls improved in later years. The cattle were managed by *663 Southern Star on a "whole herd concept" which meant that the cattle in the several ranches were treated as though they were all owned by Southern Star and the management practices, both good and bad, were applied to the cattle irrespective of whether in fact owned by Southern Star or allocated to one or more of the investor herds. There was never any segregation of cattle by investor herds which might be scattered at random through the three ranches. At least in theory any investor, with his list of cattle, could go to the proper ranch or ranches and have the particular cattle located and pointed out. This may have become a fact in the middle and later years of Southern Star's existence but few, if any, investors ever sought to do this. Again in theory it was possible for any investor to take possession of his cattle and remove them from Southern Star's ranches provided the unpaid balance of the purchase price and all management fees were paid. [4] No investor ever sought to do this. During the middle 1970's, considerable testing of Southern Star cattle was carried out at the Missouri ranch under the auspices of the University of Missouri. Southern Star eventually held sales of *664 selected cattle, both cows and bulls, with reasonably good prices realized, the cattle apparently being recognized as of good quality. We cannot, on this record, make any estimate of the number or percentage of the entire Southern Star herd which was of better than average quality, but we do not believe the percentage was significant. In general, assignment of cattle to investor herds, at least after the record keeping had been refined to such point as to make this feasible, was carried out on the basis of cattle held in an unassigned inventory. The evidence shows, however, that in many instances a particular cow assigned to one herd would be assigned to another investor herd before the cow had been repurchased by Southern Star. It thus appears as though there were many instances of the same cow being sold to more than one investor at the same time. However, we believe that most if not all of these instances of so-called double sales resulted from bookkeeping delays and poor inventory control practices rather than from any intent on the part of Southern Star to defraud investors *665 by selling the same animal to more than one person. Also, on at least one occasion, a purchase of cattle was agreed upon but delivery delayed for approximately 1 year. During that year cattle included in this purchase were assigned to some herds. Southern Star consistently followed the practice of removing cattle from investor's herds for several reasons. Culls were removed to be sold to beef markets with replacements generally made at least during the middle 1970's. In order to permit investors to purport to realize profits in 2 out of 5 years for the purposes of the section 183(d) presumption, purchases were made by Southern Star at inflated prices. [5] Also Southern Star occasionally repurchased herds from investors who wished to get out of the program. Such cattle were supposed to be returned to the general inventory from which assignments to herds were made but reassignment to a second herd was frequently made prior to removal although perhaps in anticipation of removal. *666 Initially, Southern Star did not treat its sales to investors as the equivalent of sales of securities registered with the SEC. Prior to May 1975, the SEC commenced an investigation and by order entered on May 14, 1975, Southern Star was enjoined from selling investor herds without registration. Its cattle programs were thereafter registered with the SEC. In the course of the registration proceedings, the SEC raised questions as to whether or not the investor purchase price was excessive. Ultimately, the SEC accepted the representations made to it on behalf of Southern Star as to the value of the Southern Star program, including the cattle as well as the management obligations and warranties. The Texas State Securities Board apparently also investigated the program in 1976 and reached a contrary conclusion. The Internal Revenue Service investigation commended in early 1977 and continued into 1979. It included recommendation of a criminal investigation, but the Department of Justice declined to prosecute. We find that during the audit by the Internal Revenue Service, its personnel received reasonable cooperation from Southern Star and its employees. There is no evidence of any *667 effort to mislead the revenue agents or to refuse to produce documents which were requested for purposes of the civil audit. The pricing of cattle to investors was based at least initially on what Levine concluded the cost would be to Southern Star to buy and maintain the cattle and to carry out the various obligations, guarantees, and warranties in the sales agreements and management agreements. Southern Star needed "up front" money in order to get its operation started. Interests in bulls, typically a one-third interest, were sold along with herds of cattle, irrespective of the size of the herd or the need for ownership of an interest in a bull, but Southern Star did not have enough money to purchase the bulls that were required in its operation. Sometime in 1971-1972, it was realized that the number of bulls was more than adequate for Southern Star's purposes and from that point on the purchase of an interest in a bull was eliminated from the program but without any reduction in the total unit purchase price. In January 1971 Southern Star itself purchased a one-third interest in a good bull named Emulous Bob of K Pride together with the right to possession of the bull. The *668 bull was actually boarded on a stud ranch in Colorado. Southern Star also purchased as much frozen semen from the bull as was available. This bull became the first "100-percent certified meat sire" of the Angus breed. Neither party has included in any brief a notation of the number of Levine and Epstein cows artificially inseminated with semen from this bull, although such information is probably available on the Levine and Epstein cow cards in the record. The rate of culling of cows and calves to be disposed of as commercial beef was extremely high during the initial years. While it did improve, there is insufficient evidence before us from which we can determine whether or not the rate of culling ever reached that rate which would be considered appropriate for a well-managed herd of cattle or whether the sale price of culls improved. Southern Star did sell some for substantial prices at public sales but the sale in October 1977 at which substantial prices were realized seems to have been selected cattle sired by a good bull. When Southern Star repurchased cattle from investor herds, there is no evidence that funds ever changed hands. The purported purchase price was simply *669 credited on the indebtedness of the specific investor. Such sales were not arm's-length transactions; rather Southern Star determined unilaterally the cattle to be purchased, the date of purchase, and the amount to be treated as paid therefore.
Levine and Epstein Herd Purchases
In the years 1970, 1971, 1972, 1973, 1974, 1977, and 1979 Levine entered into nine purchases of herds of varying numbers of animals. Each purchase was accompanied by execution of sales and management agreements, promissory notes, security agreements, and the like. In the years 1970, 1972, 1974, 1976, and 1979, Epstein made eight purchases of herds, executing similar documents. The 1970 agreements provided for the purchase by Levine of 15 cows and by Epstein of 50 cows (treated as sales of 2 herds of 25 cows each.) The cows of each purchaser were represented to be breeders capable of being registered with the Association. Each individual paid $ 2,000 for each cow and $ 10,000 for a one-third interest in a bull. (Epstein purchased two one-third interests in bulls.) Out of the 15 allegedly purebred Aberdeen Angus cows purchased by Levine on March 12, 1970, one cow was 12 years old and thus close to *670 the expiration of her usefulness, 9 animals were actually calves under 7 months of age, and a bull, a one-third interest in which Levine purchased, was just over 5 months old. Thirty of Epstein's cows were 6 months of age or less. One of the bulls, an interest in which Epstein acquired, was not Aberdeen Angus and was sold by Southern Star in December 1970 for $ 463. The other bull was under 6 months old. There is no satisfactory explanation of the assignment of so many calves to what were supposed to be breeding herds of cattle. The herds purchased in 1970 were resold by Levine and Epstein to Southern Star pursuant to letters dated April 15, 1972, although both Levine and Epstein on their respective 1972 Federal income tax returns reported the resales as effected in November 1972. We do not know how the repurchase price was calculated or the disposition of the cows and calves repurchased. there were problems with these herds and the 1972 program was considered by Levine to be "better" [6] than the 1970 program. The respective management agreements pertaining to *671 the 1970 herds guaranteed at least a 90-percent annual live calf birth rate, commencing with the calendar year 1971 and provided that if the calf guarantee was not met Southern Star would transfer to the owners and add to each herd a sufficient number of animals to make up for the deficiency. By the end of 1971, five calves and been born to Levine's herd of 15 cows. By the end of 1971, 24 calves had been born to Epstein's 1970 herd of 50 cows. In neither case were any cows added to either herd, although two cows were sold and replaced. The record contains information from cow cards on many of the cattle assigned to other herds of Levine and Epstein but no useful purpose will be served by summarizing those facts. Several herds of Levine and Epstein were replaced with exotic herds. Many of these herds suffered from problems similar to the 1970 herds, with deficiencies in calving rates, in the breeding of cows, in replacing culled cattle, etc. In fact in 1979, 1980, and 1981, many cows were removed from herds and sold without replacements being assigned. It is a reasonable inference that such actions reflected attempts to raise money in order to stave off bankruptcy. Several herds *672 were reduced to one cow or to no cows. Most of the sales prices realized from sales of culls were small amounts. The documents pertaining to the later purchases by both Levine and Epstein appear to be slightly more detailed and sophisticated in form and language. By contrast to the 1970 agreements, there is an express obligation on Southern Star to cull periodically. The life birth calf guarantee is reduced to 80 percent. The replacement guarantee as to cows dying was extended from 8 years in 1970 and 1971 to 10 years thereafter. As a special benefit to these two investors, the provision for cash payment of maintenance costs was waived although the customary provision for other investors was for cash payments for the first 3 years. The contracts up through 1974 transactions provided that replacements would be similar in age, sex, and value to the deceased animal whereas in the later contracts the language was changed to replacement with "animals of comparable quality." The purchase price per cow which started at $ 2,000 in 1970, increased to $ 2,500 in 1971 and 1972 and to $ 7,200 in 1973 and finally to $ 8,000 with respect to the 1974 and later purchases. With the exception *673 of the 1970 agreements, the various documents appear to be on standard forms with relatively minor differences between years. The documents are similar in all material respects to documents entered into by other Southern Star investors in the previously tried cases whose years are identical with or overlap the years in which Levine and Epstein made their purchases. We assume therefore that Levine and Epstein, again with the exception of the 1970 agreements, used for their own transactions the same form of documents currently in use for other investors. [7] While Levine and Epstein may have been motivated in part to become investors in order to be able to represent to other investors that they as officers of Southern Star had sufficient confidence in the Southern Star cattle programs to warrant their own investment, their major motivation was to obtain tax benefits. *674 Starting with the 1970 agreements, the management agreements granted to Southern Star, as long as any part of the purchase price remained unpaid, "full control of the location, maintenance, expansion, breeding, and culling of the herd * * * and the determination of the most opportune time for sales from the herd." Southern Star's control was also extended specifically to the determination of which animals to sell and the prices to be paid therefor, the retention of progeny in the herd, and the replacement of animals. With respect to Epstein's December 2, 1974, purchase, on December 28, 1976, he executed a replacement note pursuant to which Epstein purported to assume personal liability for $ 35,917 out of the principal amount of $ 38,917. The note further provided that Epstein could elect to cease to be personally liable after the birth of 12 live calves and after $ 5,000 had been realized from cattle sales or otherwise. Thirty percent of the proceeds from cattle sales was to be credited first against the recourse portion of the note. The unpaid balance was due 20 years from the date of the replacement note. Similar notes were executed with respect to later purchases. The *675 language of these purportedly partly recourse notes was utilized solely in an effort to comply with the "at risk" provisions of section 465. [8] We find that there never was any intent on the part of Southern Star or Levine and Epstein for either of these individuals to become personally bound to pay any portion of any of the promissory notes purportedly reflecting the purchase prices of cattle herds. Sometime in 1973 to 1974 Levine received from Nathan Newman (Newman) a document which Newman had received from an Internal Revenue Service employee with respect to the Southern Star program. The document appears to be an expression of an opinion by the author that the deductions taken by investors in the program were permissible, based, of course, on the information made available to the author of the document. The name of the investor and the name of the author of the document are unknown. While Levine and Epstein both understood that this document did not purport to represent an official position of the Internal Revenue Service, we find that they did believe *676 that it reflected at the time the approval of the program on audit. We further find that both Levine and Epstein also reasonably believed that the SEC had approved the Southern Star program, including the pricing of the cattle. By 1981 or 1982 Southern Star was insolvent and ceased business. Some of the cattle were sold and some including cattle from Levine's and Epstein's herds were transferred to Phil Sanders, another cattle rancher who moved the cattle to the State of Mississippi to be handled as a commercial herd. The purported ownership of Southern Star's investors in individual cattle was converted to an undivided interest in a single large herd. Most of the Southern Star investors at that point simply abandoned their investments. There is no evidence in this record to show that any investor received any cash from the liquidation of that investor's herd. Levine and Epstein appear to have made some effort to create the appearance of maintaining an interest in their herds but they remained obligated to make substantial payments to the new rancher in order to secure possession of these cattle. We find that actually both individuals abandoned their herds. ULTIMATE FINDINGS *677 OF FACT The cattle sold by Southern Star to Levine and Epstein were grossly overvalued. They were worth no more than the average of the Association audition prices during respective years in which the Levine and Epstein purchases were made. The values of the warranties and guarantees were also grossly overstated. Hence whether one views the purchase of cattle and the cattle maintenance provisions as integral parts of a single purchase or as separate purchases of cattle and of the cattle maintenance programs, the prices charged to Levine and Epstein were excessive. We further find, however, that none of the underpayments of income tax during the years before the Court, to the extent attributable to deductions arising out of the purchases by Levine and Epstein of herds of cattle from Southern Star, are due to fraud. OPINION
General
We note at the outset of our discussion that it is particularly difficult to deal with subjective factors such as the intent and knowledge of an individual in the circumstance where the role of the individual as an investor is markedly blurred by the fact that the investor is at the time a prime mover in a corporation with which the investor *678 does business. As the sole shareholders from October 1971 until the collapse of Southern Star, Levine and Epstein completely controlled its activities. While there is testimony that they were treated by Southern Star in the same fashion as other investors, the facts belie those statements. For example, no other investor simply exchanged his herd for a new herd after 2 years of operations. Maintenance fees were not waived for any other investor. There is at least no testimony that other investor's herds of purebred Aberdeen Angus (if there were any) were changed into herds of exotic cattle when Southern Star's emphasis changed to exotic cattle. We find it difficult to conclude that the assignment of a substantial number of young calves to the original Levine and Epstein herds was merely accidental. The explanation given by Levine or Epstein for their respective investments in herds is that it was important from the standpoint of selling to investors to be able to demonstrate that the two shareholders were also investors in the program. Whether that purpose, if in fact it was part of the motivation for the investments, was a benefit to Levine and Epstein individually or merely *679 to them as shareholders of Southern Star is uncertain. However, in this case it is necessary for us to distinguish between individual activities and the corporate activities and the status of the individuals at particular times and in particular circumstances. The issues involve the deductions claimed by Levine and Epstein as a result of their respective purchases of herds of cattle and whether the underpayments of tax, resulting from our disallowance of such deduction, is due to fraud. [9]
Petitioners have essentially taken somewhat contradictory positions. They argue that Levine and Epstein "had the power, according to their *680 contracts, to terminate the agreement and take possession of these animals." At the same time, they also argued that these two investors had complete control over their herds because as officers of Southern Star they participated in the management of its ranches. Petitioners cannot have it both ways. They must bear the consequences of the form of the transaction which they concocted. Coleman v. Commissioner,87 T.C. 178, 201-2003 (1986), affd. without published opinion    F.2d    (3d Cir., Oct. 27, 1987). Petitioners do not even argue that Southern Star was their alter ego and the evidence is strongly to the contrary. They have argued that as individuals they were in the ranching business, but as investors they were not engaged in any business. The contract documents show that the investors' status was passive. As officers and directors of Southern Star, their business was that of being an executive employee. Primuth v. Commissioner,54 T.C. 374, 377 (1970). Thus, from the standpoint of determining whether or not the benefits and burdens of ownership passed to Levine and Epstein, we are constrained to look at the transactions solely *681 from their standpoint as investors and as though they were in fact unrelated to Southern Star. Their investments must be tested as of the dates of their respective herd purchases. As officers and directors, the individuals could have caused the company to do whatever they wished with respect to their own investments. In fact Levine and Epstein appear to have favored themselves as investors in numerous instances. However, the fact of this indirect control over their herds cannot help them in our analysis of the benefits and burdens of ownership issue. On the other hand, where the knowledge of Levine and Epstein becomes an issue, as for example in our analysis of the fraud determination, we must take into account their actual knowledge however acquired. [10] Where profit motive becomes material, they are bound by their knowledge of Southern Star's entire program at the critical time. Value
Both parties presented expert *682 testimony. Petitioner's expert Dr. Dean A. Danilson is an assistant professor in the Animal-Dairy Science Department at Auburn University. As might be expected his report tends to have a more academic flavor than the report of respondent's expert David R. Pingrey who is, and for many years has been, actively engaged in various phases of the cattle business. Since 1970 he has been co-owner and manager of Black Bull Cattle Co., a registered Angus cattle operation located in the State of Mississippi. Both individuals are well qualified in their respective fields, but the written reports and the testimony of neither expert is entirely satisfactory. Dr. Danilson based his evaluation principally on the Southern Star prospectus issued June 10, 1985, and upon specimen contract documents which he examined. His evaluation of the cattle commenced with a basic average cost per head of $ 650 which is stated in the prospectus to be a representative cost. Dr. Danilson did not examine all of the contracts by which Southern Star acquired the various cattle which were placed into investor herds and he made no effort to ascertain the actual cost of the cattle assigned to any of the several herds *683 of either Levine or Epstein. The average cost of $ 650 is justified in part by comparison with the average auction sale prices for Angus females as published by the Association [11] during the period 1970-1985, as follows: Auction
Year
Average
1970
503  1971
468  1972
526  1973
708  1974
753  1975
520  1976
537  1977
652  1978
703  1979
1,096
1980
1,025
Mr. Pingrey concludes that Southern Star purchased cattle in large groups. Two such groups had prices ranging from $ 550 to $ 600 per head. Thus the cost of the cattle as set forth in the prospectus is reasonably close to prices actually paid by Southern Star and approximates the auction prices in the mid 1970s. However, these figures do not necessarily reflect the actual value of the specific cattle allocated to any of the several herds of Levine or Epstein, especially when as noted many of the cattle were under age when originally purchased, others may not have been purebred Aberdeen Angus or at least were not registered with the Association as such and in some instances cattle *684 of mixed breeds were assigned to the herds. Dr. Danilson assumed a 15-year contract period based on the prospectus. He placed a value of $ 1,707 on the cow fertility warranty, $ 316 on the lifetime warranty, and $ 255 on the percentage calf crop warranty for a total warranty value of $ 2,278. This figure he compared with the prospectus value of $ 2,040. Dr. Danilson increased the average initial animal cost to $ 900 by assuming that various maintenance and management fees should be added on the theory that Southern Star would be required to hold the animals for 120 days after purchase and before resale to investors. To these costs he adds sales expenses and commissions to reach a total animal cost/value of $ 3,603. The $ 8,000 sales value set out in the prospectus represents a mark-up of approximately 120 percent, which Dr. Danilson finds to be reasonable. Dr. Danilson further concludes that the actual cash management costs charged to the investors of $ 733 per cow for the 3-year period is not out of line for purebred Aberdeen Angus cattle as distinguished from commercial cattle. With respect to the profit potential, and again basing his analysis largely on the description *685 of the operation in the prospectus, Dr. Danilson concludes that the prospectus projections "appear somewhat skewed." It would take a contract period of 25 years rather than 15 years in order "to achieve any level of profitability and return on the investment." If tax benefits are not taken into account, it is concluded by Dr. Danilson that every cow on the farm would have to generate over $ 1,500 in income each year in order to realize a profit potential in 15 years. Dr. Danilson further concludes on the basis of his discussions with three of the principal managers during the period 1973 through 1980 that the management programs "were excellent, well planned, and I would say, ahead of their time." Unfortunately Dr. Danilson made no effort to evaluate the specific cows and bulls (or calves) actually assigned to the Levine and Epstein herds. Dr. Pingrey's opinion was based largely upon actual contracts covering the Levine and Epstein herds together with as many cow cards as were made available to him for his inspection. [12] In Dr. Pingrey's opinion, the program was without "production profit potential" for either investor, the prices charged for the cattle were completely out of line *686 with Southern Star's "purchase costs" as well as the "sale prices" received when cattle were later sold outside the program; the maintenance charges were "unacceptable," and the warranties "of very limited value." We discount Dr. Danilson's report for the following reasons. What he analyzed was the concept of the Southern Star program as outlined in the prospectus, not the actual value of the cattle purchased by these two investors. He assumed in making his evaluation a well managed herd of registered Aberdeen Angus cattle in good condition. The evidence in this case as to the cattle actually allocated to the herds of the two individuals does not give us a basis on which to find that their cattle or the company's program were of the quality *687 assumed by Dr. Danilson. While the Missouri operation may at one time have had some indeterminate number of top quality cattle, there is no evidence to show that Levine and Epstein herds were made up exclusively or largely of that quality animals. In fact, the evidence is to the contrary, including their own testimony that they were treated like any other Southern Star investor. Dr. Danilson's valuations are too theoretical and hypothetical. Moreover, his estimation of a 25-year period for the investment in a herd to be profitable assumes a quality operation, not the actual operation of Southern Star. Even if we accepted Dr. Danilson's approach, the evidence before us convinces us that it would have taken a far longer period of excellent management to produce a profit from Levine's and Epstein's herds, with perhaps the exception of one herd purchased by Levine. The programs were overpriced from an investment standpoint. We find Dr. Pingrey's valuations to be somewhat overly pessimistic. They seem to be largely influenced by the chaotic conditions of the Southern Star management during its first 3 to 4 years and on the poor performance reflected by the cow cards. Mr. Pingrey *688 uses too much hindsight. Nevertheless, he is not far from correct. Based on the entire record, the most satisfactory indication of the value of the cattle purchased by Levine and Epstein during each of the years is the average auction sales price as reported by the Association. Those prices are not far from the actual prices paid by Southern Star which we believe to be the best criterion of value. There were a few instances where Southern Star paid more than these auction average prices and many instances where less was paid. In this circumstances use of an objective average is fully justified. Whether or not any of the warranties or guarantees had a significant value and if so what that value might be remains on this record an open question, but we are convinced that the cattle must be valued separately from the management program. We need not determine whether or not that management program constitutes an intangible asset with a determinable useful life which might be amortized. The management agreements do not contain any fixed termination date. None was agreed to by the parties. Thus *689 the useful life of the program is not capable of determination and there is, therefore, no basis to determine an annual amortization amount. Petitioners urge us, as an alternative, to find that they suffered a loss from failure to exercise an option to purchase the cattle by paying the full purchase price. Unfortunately, there is no evidence in this record of an intent to exercise such an option. Neither is there any clear evidence as to when that failure to exercise the option occurred. We have concluded that at some point in this time the two individuals in fact abandoned whatever interest they had in Mr. Sanders' herd. That is, however, contrary to the testimony. Moreover, this theory was raised for the first time on brief; it comes too late. Rollert Residuary Trust v. Commissioner,80 T.C. 619, 627 (1983), affd. 752 F.2d 1128 (6th Cir. 1985).
Benefits and Burdens of Ownership
Transactions similar to petitioners' investments in the Southern Star cattle *690 programs have been frequently analyzed by this Court on the basis of the following factors: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether the purported purchaser acquired any equity in the property; (4) whether the contract creates a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party bears the risk of loss or damage to the property; and (7) which party receives the profits from the sale of the property.
Houchins v. Commissioner,79 T.C. 570, 591 (1982); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237-1238 (1981); Estate of Franklin v. Commissioner,64 T.C. 752, 763-770 (1975), affd. on other grounds 544 F.2d 1045 (9th Cir. 1976); Harmston v. Commissioner,61 T.C. 216, 228-231 (1973), affd. 528 F.2d 55 (9th Cir. 1976). As we have done in Cherin, and in Hunter, Siegel and Jacobs[13] we will give to Levine and Epstein the benefit of the doubt and assume for purposes of our analysis that bare legal title was transferred *691 to each of them with respect to each of their respective herds of cattle. However, courts have repeatedly "refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred." Frank Lyon Co. v. United States,435 U.S. 561, 572-573 (1978). As in each of the other cases, under the provisions of the sales and management agreements, Southern Star retained full and complete control over the cattle allegedly sold to Levine and Epstein. It is clear on this record that neither investor could have obtained possession and control over herds of cattle without payment in full to Southern Star of the entire purchase price plus all unpaid maintenance charges, an action neither of these individuals intended to take. Even in this case where the maintenance charges were waived for the first 3 years (except for the 1970 purchases), the provisions for allocating one half of the calf crop to Southern Star were not overridden. The significance *692 of passage of bare legal title, if it has any significance, is further eroded by the continued registration of the purebred Angus cattle purportedly purchased by Levine and Epstein either in Southern Star's name or in the name of some prior owner. Continued registration in Southern Star's name obviously facilitated the handling of the herds and may have been a practical necessity, but it simply reenforces our conclusion that the benefits and burdens of ownership did not in fact pass to Levine and Epstein individually. The parties did not treat the transactions as present sales. Levine and Epstein as investors acquired no rights or obligations and the purported sales had no effect on Southern Star's unilateral authority over and responsibility for the cattle. Neither Levine nor Epstein in his capacity as an individual investor had any voice over whether any particular cow was allocated to any of his herds, retained in his herds, *693 sold, or transferred to another herd. Only as an officer of Southern Star could any such control be exercised and for most of the period Levine not Epstein had day-to-day operating authority. There was no segregation of the cattle into separate investor herds. All of the cattle were in fact treated as owned by Southern Star. While this may have been a necessary management prerogative, Levine and Epstein must bear the consequence. As in the other cases, Levine and Epstein were to some extent providing southern Star with funds needed to develop its own herd although in this instance we doubt that that factor had anything to do with the motivation by Levine and Epstein to purchase herds. As in the other Southern Star cases, we conclude that the disparity between the purchase price for the cattle and their fair market value precluded petitioners from acquiring any equity in the cattle they purported to purchase. We do not believe there was ever any intent to enforce the purported recourse notes against themselves or that either they or Southern Star ever intended that those notes be paid *694 except as paper transactions. We find it impossible to believe that either Levine or Epstein really thought that their projections of profit applied in fact to them. They both knew that they had no experience in managing cattle when they made their initial purchases. When they made their later purchases they knew even more clearly that their operations were not succesful. Had they examined the cow cards applicable to their own herds they would certainly have known that Southern Star was not carrying out its obligations under the management agreements. They in fact had this knowledge as officers of Southern Star. Even were we to give Levine and Epstein the benefit of great doubt in 1970 and conclude that they were merely overcome by their enthusiasm for their new venture and really hoped to make a profit, which we do not believe, it certainly would have been evident in later years, had they as investors inquired, that Southern Star itself was in bad financial condition. Since Southern Star was not complying with its obligations on earlier herd purchases, there was no reason to suppose circumstances would change. They as investors could have predicted that the profit projections *695 originally made or contained in the prospectus or elsewhere would not be met. However much good faith one may accord Levine and Epstein in their efforts on Southern Star's behalf to develop a quality program, in fact it did not do so, as they well knew. Levine and Epstein have simply failed to convince us that they as investors ever had a realistic objective of making a profit. Thus we cannot find that either purchaser ever acquired an equity in the cattle or ever had any intention of paying the nonrecourse or recourse portions of the purchase prices. The efforts to convert some portion of the notes to recourse status to comply with the at risk rules was a subterfuge. Also the right of possession never vested in either purchaser as an investor and neither purchaser bore any risk of loss or damage to the property. Finally, there were no real profits from the liquidation of the cattle. Levine and Epstein purported to transfer what cattle they had left to Mr. Sanders, after which point there was not even a theoretical possibility of paying off the indebtedness. We are convinced that what each of these investors hoped was that Southern Star itself would achieve such success in *696 the breeding of cattle that its reputation and its assets would make their stock valuable. Viewed in its entirety, the arrangements between Levine and Epstein on the one hand and Southern Star on the other do not support a finding that any benefits or burdens of ownership were transferred either to Levine or to Epstein. Thus no sales occurred which can be recognized for tax purposes.
Economic Substance
Having concluded that the benefits and burdens of ownership did not pass to Levine and Epstein, no useful purpose would be served by discussing in any extended fashion the fact that here as in the other Southern Star cases, the transactions lacked economic substance. The facts found here do not differ materially from the facts in the other cases.
Fraud
Respondent determined additions to tax for fraud against each set of petitioners for each of the years before the Court. However, since respondent has conceded the fraud addition with respect to the respective spouses, the issue before us is solely as to the fraud addition against Levine and Epstein. *697 Under section 6653(b) respondent has the burden of proof by clear and convincing evidence. Section 7454(a); Rule 142(b). To meet this burden, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner,80 T.C. 1111 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Estate of Pittard v. Commissioner,69 T.C. 391 (1977). Fraud is not to be imputed or presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970); Otsuki v. Commissioner,53 T.C. 96 (1969). However, fraud may be proven by circumstancial evidence because direct proof of the taxpayer's intent is rarely available. Rowlee v. Commissioner, supra.The taxpayer's entire course *698 of conduct may be examined to establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, supra at 105-106 (1969). The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States,317 U.S. 492, 499 (1943). A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justified the inference of fraud. See Holland v. United States,348 U.S. 121, 137 (1954); Otsuki v. Commissioner, supra.However, the mere failure to report income is not sufficient to establish fraud. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962). Other badges of fraud which may be taken into account include: the making of false and inconsistent statements to revenue agents, Grosshandler v. Commissioner,75 T.C. 1, 20 (1980); the filing of false documents, Stephenson v. Commissioner,79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984); understatement of income, inadequate *699 records, failure to file tax returns, implausible or inconsistent explanations of behavior, concealment of assets and failure to cooperate with tax authorities. Bradford v. Commissioner,796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. The badges of fraud upon which respondent relies in this case are the alleged intentional overstatement of deductions, losses and credits, creating underpayments of income tax which arose basically out of the inflation of the prices of cattle. In addition respondent constructs badges of fraud out of the poor record keeping, poor inventory control, and lack of good management, especially in the early years which resulted in the apparent sales of cattle prior to their purchase by Southern Star. Other allegedly fraudulent acts include the repurchases of cattle at inflated prices in order to allow investors to show profits for purchases of the section 183 presumption and apparent back dating of and inconsistencies in dates between documents. These actions are alleged to constitute "the intentional use of false and misleading statements to disguise the true nature of the transactions involved," committed by Levine *700 and Epstein personally. Finally, petitioners are charged with selling only proposed tax benefits and not an interest in cattle breeding herds. The authorities on which respondent relies are Snyder v. Commissioner,T.C. Memo. 1985-5; Toussaint v. Commissioner,T.C. Memo. 1984-25; Monahan v. Commissioner,T.C. Memo. 1968-234; Cowarde v. Commissioner,T.C. Memo. 1968-158. These particular memorandum decisions are simply not in point. In Monahan, we found the taxpayer to be guilty of intentionally omitting income from his return over a period of years and the claiming of deductions for business expenses, interest, and medical expenses that were never substantiated in the slightest degree, including the claiming of certain items which we treated as "patently frivolous." In Cowarde the taxpayer testified falsely as to a theft loss which never occurred, presented altered sales receipts to respondent's agent and was found to have participated in a deliberate scheme to defraud. In Toussaint, we found that a revenue agent had fabricated a theft loss of a Picasso painting which he had never owned and on his *701 return he claimed a loss equivalent to its alleged fair market value on the date of the alleged theft although he clearly knew he could not appropriately claim an amount in excess of the basis of the alleged painting which, by his own testimony, he obtained many years before. Finally, in Snyder, we determined fraud against a taxpayer-husband based on his participation in a scheme to file fraudulent income tax returns for a subchapter S corporation by including in returns for several years depreciation deductions on fictitious equipment. The short answer is that no one of these cases has any bearing on the case at bar. We are convinced in this case that Levine and Epstein intended to cause Southern Star to develop for its benefit a first-class cattle ranch operation, an intention which they were simply not capable of carrying out. While Levine was a certified public accountant with considerable experience in giving tax advice and in preparing income tax returns and Epstein was knowledgeable in the area, respondent has failed to convince us that either individual intentionally fabricated inflated sales prices for their cattle herds and management programs for the purpose *702 of obtaining false tax deductions. Of course they were each aware that the cost of cattle to each investor was far in excess of the cost of the cattle to Southern Star. However, they believed that they were selling packages consisting of herds of cattle accompanied by a management program extending over a period of years with extensive guarantees and warranties. The information received by Levine from Newman as to the apparent approval of the program by the Internal Revenue Service on audit and the justification of the values to the SEC certainly gave each of them as officials of Southern Star some basis for continuing to sell the programs. The refusal of the Texas authorities to permit sale of programs in that State does not necessarily preclude reliance on the approval given by the SEC. For the purposes of the fraud addition, we consider whatever knowledge and actions each individual had and took. Proof of the claiming of losses on Federal income tax returns over a period of years from successive *703 tax shelter investments, even where the primary motivation of the investors was to obtain tax benefits rather than an ultimate profit, does not sufficiently discharge respondent's burden of proof. We must look at the action taken in the light of the circumstances prevailing in the years before the Court without hindsight. We remain unconvinced that either Levine or Epstein prepared and filed Federal income tax returns with the intent to evade the payment to respondent of income taxes known to be owing. The actions of Levine and Epstein, especially the former since Epstein had relatively little involvement, during respondent's audit of Southern Star and of their individual returns is inconsistent with the existence of a fraudulent intent on the part of the individuals. On this issue we hold for petitioners. Appropriate orders will be issued.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent has conceded that the additions to tax for fraud do not apply to petitioner Marian Epstein or to petitioner Gail L. Levine, whose estate was substituted for her as a petitioner upon her death. ↩
3. In describing the transactions between Levine and Epstein, respectively, and Southern Star we use words such as "purchase," "sale," "owned," "owner," and similar terms simply for convenience without intending any inference by the use of these words as to the tax characterization or consequences of any aspect of the transactions. Also, certain transactions between one or the other of Levine and Epstein were with one or more subsidiary of Southern Star including G & L Management, Inc. There is no evidence in this record as to why any subsidiary rather than Southern Star was used as a party to any transaction and the parties have not attributed any significance to such fact. Therefore, again for convenience we will ignore the existence of G & L Management, Inc. and all other subsidiaries and will treat all Levine and Epstein transactions as having been made with Southern Star. ↩
4. In some of the contracts the purchase price was discounted if the investor acted within 3 years. ↩
5. Section 183(d) was amended by substituting 3 years for the 2-year period for activities other than breeding, etc. of horses by section 143(a)(1) and (2) of Pub. L. 99-514, 100 Stat. 2120, effective for the years beginning after Dec. 31, 1986. ↩
6. We were not informed as to why the 1972 program was "better." That word is simply Levine's explanation. ↩
7. Although both Levine and Epstein testified that they were treated by Southern Star like any other investor, and that may have been true with respect to the initial assignment of cattle to their contracts and the failure to make good on various guarantees and warranties, both individuals obviously received special treatment from Southern Star such as the repurchase of the 1970 herds, the waiving of maintenance fees, and the substitution of exotic herds during the period in which Southern Star's breeding program favored exotic cattle. ↩
8. Section 465 was added by Pub. L. 95-600, generally effective with respect to tax years commencing after Dec. 31, 1975. ↩
9. We are not unmindful of the fact that in this case both Levine and Epstein reported sales of cattle, particularly manipulated sales at exorbitant prices to Southern Star, as ordinary income. They further reported as a taxable transaction the sales of their initial herds back to Southern Star. Respondent has conceded, however, that if we find that the purchases of cattle lack economic substantial or that the benefits and burdens of ownership did not pass to Levine and Epstein, the income reported from such sales will be removed from their income. ↩
10. Whether we should consider in this case as badges of fraud actions taken by Southern Star, not simply knowledge acquired by Levine and Epstein in their corporate activities, is unclear. Since respondent has not raised the issue, we need not decide it.↩
11. These prices are a combination of those set out in both expert's reports. ↩
12. Counsel for respondent and for petitioners argued extensively as to whether or not Dr. Pingrey's report was deficient because his initial report was based on a relatively low percentage of the total cow cards produced by petitioners. However, by the conclusion of the trial, Dr. Pingrey had actually examined most if not all of the relevant cow cards. We do not find that this problem has any material effect on the opinion of Dr. Pingrey. ↩
13. Cherin v. Commissioner, 89 T.C.    (Nov. 23, 1987); Hunter v. Commissioner,T.C. Memo. 1982-126; Siegel v. Commissioner,T.C. Memo. 1985-441; Jacobs v. Commissioner,T.C. Memo. 1985-609↩.